21-870-cv
JLM Couture, Inc. v. Gutman

# United States Court of Appeals
## for the Second Circuit

August Term, 2021

(Argued: October 25, 2021          Decided: January 25, 2022)

Docket No. 21-870

_____

JLM COUTURE, INC.,

*Plaintiff-Appellee,*

v.

HAYLEY PAIGE GUTMAN,

*Defendant-Appellant.*[*]

_____

Before:

NEWMAN, LYNCH, and PARK, *Circuit Judges.*

Hayley Paige Gutman, a bridal designer and social media influencer, appeals from a preliminary injunction ("PI") entered by the United States District Court for the Southern District of New York (Swain, *J.*). The PI, based in part on a 2011 employment agreement between Gutman and bridal gown company JLM Couture, Inc. ("JLM"), orders Gutman not to compete with JLM through the end of her contractual term, enjoins her from using her name and its derivatives in trade or commerce, and grants JLM exclusive control over three disputed social media accounts for the duration of the litigation. We conclude that the district court did not abuse its discretion in entering the noncompete and name-rights prongs of the injunction, which properly flow from JLM's likely meritorious claims

_____

[*] The Clerk is respectfully directed to amend the caption accordingly.

against Gutman for breach of contract. Nor did the district court err in rejecting Gutman's contention that JLM breached the contract by refusing to pay her after she stopped working. We agree with Gutman, however, that the district court exceeded its discretion by transferring exclusive control over the disputed social media accounts to JLM while explicitly declining to assess whether JLM would likely succeed on its claim that it owned the accounts. We therefore **AFFIRM** the order in part, **VACATE** in part, and **REMAND** the case for further proceedings consistent with this opinion.

Judge NEWMAN concurs in part and dissents in part in a separate opinion.

Judge LYNCH concurs in part and dissents in part in a separate opinion.

RICHARD D. ROCHFORD, JR. (Joseph C. Lawlor, *on the brief*), Haynes and Boone, LLP, New York, NY, *for Defendant-Appellant*.

SARAH M. MATZ (Gary Adelman, *on the brief*), Adelman Matz P.C., New York, NY, *for Plaintiff-Appellee.*

PARK, *Circuit Judge*:

Hayley Paige Gutman is familiar to many brides as the namesake of the "Hayley Paige" line of wedding dresses. She is also known to many social media users as the "influencer" behind several "Miss Hayley Paige" accounts on platforms like Instagram, Snapchat, TikTok, Spotify, and Pinterest. But after Gutman announced her intent to resign from the wedding gown company JLM Couture, Inc. ("JLM"), JLM claimed the rights to the "Hayley Paige" trade name and ownership of three of the "Miss Hayley Paige" social media accounts. As their differences escalated, Gutman advertised an independent appearance at a bridal

2

expo, used the "Hayley Paige" name to promote non-JLM brands, and locked JLM employees out of the "@misshayleypaige" Instagram account. JLM ultimately sued Gutman, claiming, among other causes of action, breach of their employment agreement (the "Contract"), trademark dilution, and conversion of the Instagram, TikTok, and Pinterest accounts (the "Disputed Accounts"). Shortly thereafter, JLM successfully moved for a temporary restraining order ("TRO") and then a preliminary injunction ("PI").

Gutman appealed. She challenges the PI provisions (1) ordering her not to compete with JLM, (2) barring her from using the name "Hayley Paige Gutman" and its derivatives in trade or commerce, and (3) awarding control over the Disputed Accounts to JLM. She also contests the district court's determination that (4) JLM did not itself breach the Contract and thereby forfeit its right to seek injunctive relief.

We conclude that Gutman's first, second, and fourth challenges to the PI are foreclosed by the plain language of the Contract. Gutman agreed to sign away various rights to JLM in exchange for her salary, a stream of royalty payments, and JLM's investment of time and capital in the Hayley Paige brand. She offers no persuasive reason why the Contract no longer binds her, and the district court did

3

not err in enforcing its clear provisions. We agree with Gutman, however, that the district court exceeded its discretion by granting exclusive control over the Disputed Accounts to JLM while explicitly declining to assess JLM's likelihood of success on its claim that it owned the accounts. More specifically, in its complaint and motion for a PI, JLM sought to gain unqualified control over the Disputed Accounts based on its claims of conversion and trespass to chattels. The district court recognized that the question of social media account ownership was "novel" and declined at the PI stage to evaluate the merits of those claims. The court nevertheless entered JLM's proposed provision transferring control of the Disputed Accounts nearly verbatim. We do not see how a grant of indefinite, exclusive control over the Disputed Accounts could be a proper remedy for any of JLM's other claims. We thus **AFFIRM** the order in part, **VACATE** in part, and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

A. <u>The Parties</u>

Hayley Paige Gutman is a bridal designer and social media influencer. JLM Couture, Inc. is a bridal design and fashion company led by CEO Joseph L. Murphy. In 2011, Gutman signed an employment agreement with JLM, which

4

originally ran through 2016 but was extended through August 1, 2022 (the "Term"). Together, Gutman and JLM have designed, manufactured, and marketed a successful line of bridal wear generating $220 million in sales of "Hayley Paige"-branded apparel in the six years preceding this lawsuit. As JLM's business grew, Gutman's persona and bridal line rose to prominence in the industry.

Gutman was formally hired to be a "designer of a line of brides and bridesmaids dresses," Contract § 2,[1] and JLM charged her with developing the Hayley Paige brand for the company. Meanwhile, Gutman became a well-known personality in part through her activity on several "Miss Hayley Paige" social media accounts. Gutman opened eight accounts under the "Miss Hayley Paige" handle or web address, three before her employment with JLM (on Facebook, Twitter, and LinkedIn) and five during her employment with JLM (on Pinterest, Instagram, Snapchat, Spotify, and TikTok). JLM claims ownership of only three: the Instagram, TikTok, and Pinterest accounts.

These Disputed Accounts, especially the Instagram account, are valuable assets. As of January 2022, the Instagram account had over a million followers.

---

[1] A redacted version of the Contract may be found at App'x 2509–22.

*See* Hayley Paige (@misshayleypaige), Instagram, https://www.instagram.com/ misshayleypaige. Control over the account comes with direct access to those followers and opportunities to monetize it. By one expert's appraisal, a single post on the account, on average, is worth nearly $30,000.

The Instagram account has included a variety of posts about both Gutman's personal life and promotions of JLM's Hayley Paige brand. For example, the posts include advertisements for wedding gowns, photos of Gutman with her dog, and Gutman's reflections on a recently released Star Wars movie trailer:



App'x at 1264, 2352, 2362.

As to the Instagram account, the district court found that "Gutman composed all or substantially all of the captions displayed with images on the [a]ccount, as well as other narrative content." *JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2021 WL 827749, at *4 (S.D.N.Y. Mar. 4, 2021). Gutman also "responded to direct messages about her personal life and answered questions about [JLM]'s products." *Id.* At the same time, another JLM employee also "shared . . . responsibility" for "managing" the account, and Murphy, JLM's CEO, sometimes gave instructions on what Gutman should post. *Id.* at *4–5. For some time prior to this dispute, @misshayleypaige was designated as a verified "Public Figure" account[2] and listed its "bio" in some terms suggesting the account was a personal one,[3] though the bio also linked to JLM's official "Hayley Paige" website.

B.    The Contract

*General*. Gutman and JLM originally entered into an employment agreement on July 13, 2011. JLM hired Gutman as a designer for a fixed "Term"

---

[2] Instagram allows for the verification of accounts held by certain "public figures, celebrities, and brands." App'x at 1121. Although the parties appear to dispute what information a "public figure" designation conveys, the district court determined that the verification process would have included Gutman's affirmation to Instagram that she "run[s] the account." *JLM Couture*, 2021 WL 827749, at *4 n.4.

[3] For example, the bio for a time read "Designer/Creator/Emoji-maker." (Gutman created a line of bridal emojis while employed by JLM. *See* Holy Matrimoji, http://www.holymatrimoji.com.)

of employment, which was initially set to expire in 2016 but which JLM exercised its option to renew until August 1, 2022. The Contract sets out a description of Gutman's duties, which include "traveling to trunk shows, traveling to China or elsewhere abroad to assist in or supervise manufacturing . . ., assisting with advertising programs, and designing bridal, bridesmaids, evening wear and related apparel." Contract § 2. It also gives JLM, but not Gutman, the power to terminate Gutman's employment "for cause" or "without cause." *Id.* § 13.

*Noncompete*. Other parts of the Contract outline several rights held by JLM or obligations owed by Gutman through the Term and beyond. Gutman "covenant[ed] and agree[d] that during the period of her employment with [JLM]," she would "not compete with [JLM], directly or indirectly." *Id*. § 9(a) (the "Noncompete Agreement"). Competition includes "engag[ing] in, or . . . associat[ing] with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent, or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale" of goods within JLM's business. *Id.*

*Name Rights, Trademarks, and Designs*. The Contract also grants JLM certain rights over the use of "Designer's Name," defined as "'Hayley,' 'Paige,' 'Hayley

8

Paige Gutman,' 'Hayley Gutman,' 'Hayley Paige,' or any derivative thereof." *Id.* § 10(a) (punctuation cleaned up). Gutman first agreed, in section 10(a), to give JLM "exclusive world-wide right and license" to the Designer's Name in connection with bridal wear for the extended Term plus two years, "provided [Gutman] has substantially participated in the design or creation of such clothing or related items." *Id.* Should JLM fail to register Designer's Name as a trademark, that license dissolves two years after "termination of [Gutman's] employment." *Id.* Next, in section 10(b), Gutman agreed to transfer to JLM the right to register the Designer's Name as trademarks (the "Trademarks") for the extended Term plus two years. *Id.* § 10(b). She also agreed:

> The Trademarks shall in perpetuity be the exclusive property of [JLM], [Gutman] having consented to it being filed by [JLM] and [Gutman] **shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce** during the Term or any time thereafter without the express written consent of [JLM].

*Id.* (emphasis added) (the "Name-Rights Agreement"). The Contract further reiterates that Gutman "assign[ed] to [JLM] . . . the Designer's Name and the Trademarks." *Id.* § 10(c). Additionally, Gutman agreed that "all designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by [Gutman] in

9

connection with her employment" involving bridal products (the "Designs") "are works for hire" deemed to be owned by JLM. *Id.* § 11; *see also* 17 U.S.C. § 101 (defining "work made for hire" under the copyright law). The Contract is silent on ownership of other kinds of property besides the Designs, the Trademarks, and the rights to Designer's Name.

*Compensation*. The Contract also details Gutman's compensation owed to her by JLM. "For the full, prompt and faithful performance of all" of Gutman's duties, she would receive base pay and "Additional Compensation" calculated based on JLM's sales of Gutman-designed products. Contract § 4, 4(a)–(b). And "[a]s additional consideration" for assigning the Designer's Name and Trademarks to JLM, Gutman would receive a percentage of revenues sold under the Designer's Name for ten years "following the termination of [her] employment with [JLM]." *Id.* § 10(c)(i).

*Remedies*. Finally, Gutman stipulated that, should she "violate any provision" of the Contract, she "consents to the granting of a temporary or permanent injunction . . . prohibiting her from violating any provision" of the Contract. *Id.* § 9(e).

10

C.     This Dispute

In the summer of 2019, JLM and Gutman entered into a new round of contract negotiations. JLM proposed an amendment requiring Gutman to perform "additional duties" that would involve "monetization," including "social media monetized opportunities" on Instagram and other platforms. App'x at 2533. Gutman rejected JLM's proposal, and the parties were unable to reach a new deal.

Following this failed negotiation, Gutman locked JLM out of the Instagram account by changing the access credentials. She then changed the Instagram account bio from its earlier version—which included descriptions of Gutman, but also linked to JLM's "Hayley Paige" website—to read "Personal & Creative account of designer Hayley Paige." App'x at 763. She also created a new "misshayleypaige" account on TikTok. As Murphy tells it,

> Issues with Gutman began on or about November 2, 2019 when Gutman created a TikTok account under the misshayleypaige name . . . and subsequently posted videos that did not represent the HP Brands, in particular the Hayley Paige Brand. . . . When I advised Gutman that she should post JLM approved content on the TikTok account only, rather than posting personal images that were off brand, Gutman responded shortly thereafter by changing the password to the Main [Instagram] Account so that JLM no longer had access to the account.

App'x at 464–65.

On two different occasions over the next year, Gutman entered into agreements with third-party companies to promote their products on the @misshayleypaige Instagram account without JLM's permission. Gutman also announced an upcoming appearance at a virtual bridal expo promoting her as a "wedding gown designer." App'x at 1197.

On December 15, 2020, JLM sued Gutman in the United States District Court for the Southern District of New York asserting breach of contract, trademark dilution, unfair competition, conversion of social media accounts, and trespass to chattels on social media accounts, among other claims. As relevant here, JLM alleged that: (1) Gutman violated the Noncompete Agreement by agreeing to appear at the bridal expo in her capacity as a designer; (2) she breached the Name-Rights Agreement and infringed on the Trademarks by using the "@misshayleypaige" Instagram account, whose handle is in the Designer's Name, for third-party promotional deals; and (3) she converted the Disputed Accounts to her own use by locking JLM out of the Instagram account and refusing to cede control of it or the TikTok or Pinterest accounts.

JLM sought injunctive relief, and the district court in large part adopted JLM's proposed order, first as a TRO on December 16, 2020 and then as a PI on

March 4, 2021.[4] The court concluded that JLM had shown a likelihood of success on its claims for breach of contract under the Noncompete Agreement and the Name-Rights Agreement, as well as on its trademark-infringement claim. The court declined, however, to decide whether JLM had shown a likelihood of success on its conversion and trespass claims or opine on the "novel" and "nuanced" question of who owns the Disputed Accounts. *JLM Couture*, 2021 WL 827749, at *1, *19. It instead tethered its relief on the Disputed Accounts to Gutman's likely "breaches of the provisions of the Contract relating to use of the Designer's Name and derivatives [§ 10(b)], assistance in advertising [§ 2], and . . . use of trademarks and Designs [§§ 10(b), 11]." *Id.* at *15. The district court then entered an injunction barring Gutman from, during the pendency of the litigation:

> 1. Making any changes to any of the social media accounts listed in Addendum 1 hereto (the "JLM HP Social Media Accounts"), including but not limited to changing the name of the handles on the accounts, posting any new content thereto and/or deleting or altering any content located therein, tagging any other posts, users or accounts, transferring any such accounts or the right to use any such account from [Gutman] to any other person except to JLM, or communicating with third parties through same for commercial purposes, without the express written permission of [JLM]'s chief executive officer, Joseph L. Murphy;

---

[4] The district court declined to order Gutman not to comment on this litigation, finding that Gutman did not clearly waive her First Amendment right to do so.

13

2. Utilizing, or taking any action to gain exclusive control over, any of the JLM HP Social Media Accounts, without the express written permission of [JLM]'s chief executive officer, Joseph L. Murphy;

3. Breaching the employment Contract, dated July 13, 2011, together with the amendments and extensions thereto, by:

a. using, or authorizing others to use, "Hayley", "Paige", "Hayley Paige Gutman", "Hayley Gutman", "Hayley Paige" or any derivative thereof, including misshayleypaige (collectively the "Designer's Name"), trademarks in the Designer's Name, including but not limited to the trademarks identified at Addendum 2 hereto (collectively, the "Trademarks"), or any confusingly similar marks or names in trade or commerce, without the express written permission of [JLM]'s chief executive officer, Joseph L. Murphy;

b. [until August 1, 2022,[5]] [d]irectly or indirectly, engaging in, or being associated with (whether as an officer, director, shareholder, partner, employee, independent contractor, agent or otherwise), any person, organization or enterprise which engages in the design, manufacture, marketing or sale of: (i) bridal apparel, including bridesmaids', mother of the bride and flower girls' apparel and related items; (ii) bridal accessories and related items; (iii) evening wear and related items; and/or (iv) any other category of goods designed, manufactured, marketed, licensed or sold by JLM;

c. using or authorizing others to use any Designs,[6] or any of the Trademarks or any variations, versions, representations or

_____

[5] The district court added this termination date on reconsideration.

[6] The district court specified:

"Designs[,"] as used here, means designs, drawings, notes, patterns, sketches, prototypes, samples, improvements to existing works, and any other works conceived of or developed by [Gutman] in connection with her employment with [JLM] involving bridal clothing, bridal accessories and related bridal or wedding

14

confusingly similar facsimiles thereof, in trade or commerce [without the express written permission of JLM's chief executive officer, Joseph L. Murphy[7]]; and

4. Using, or authorizing others to use, any of the Designer's Names, Trademarks or any confusingly similar term, name, symbol or device, or any combination thereof, in commerce in connection with any goods or services, including to endorse, advertise or promote the products and/or services of herself or others directly or indirectly, including but not limited to on social media or in television or media appearances, without the express written permission of [JLM]'s chief executive officer, Joseph L. Murphy.

To the extent not previously delivered, within 24 hours of the entry of this Memorandum Opinion and Order [Gutman] shall deliver to [JLM]'s attorneys the current login credentials, including the current username and password for the [Instagram a]ccount . . ., the Pinterest and the TikTok accounts with the handle "misshayleypaige," and take any action necessary to enable JLM to regain access and control of the JLM HP Social Media Accounts, including linking the accounts to one of JLM's email addresses and/or phone numbers and/or other social media accounts as requested.

*JLM Couture*, 2021 WL 827749, at *23–24 (emphasis omitted). "Addendum 1" in the first paragraph of the PI refers to a list of eighteen social media accounts supplied by JLM as "Exhibit 1" in its PI motion. *Compare* No. 20-cv-10575, Dkt. 86, Ex. 1 (S.D.N.Y. Jan. 30, 2021), *with* Spec. App'x at 56. The list includes the three

---

items, either alone or with others, from the commencement of her employment by [JLM] through the Term of the Contract. The term includes content created or compiled for the JLM HP Social Media Accounts.

*JLM Couture*, 2021 WL 827749, at *23 n.21.

[7] This proviso was added on reconsideration.

15

Disputed Accounts, which are also singled out in the final paragraph of the PI quoted above, along with fifteen other accounts the ownership of which Gutman does not challenge in this lawsuit.

After JLM took over the Disputed Accounts, it changed the designation of the Instagram account from "Public Figure" to "Clothing (Brand)" and again changed the account bio, which now includes the lines "Official page of Hayley Paige Bridal" and "Managed by MHP Social Team," accompanied by a profile photograph of the logo "Hayley Paige." Hayley Paige (@misshayleypaige), Instagram, https://www.instagram.com/misshayleypaige. JLM continues to post regularly on the Instagram account. *See id.* JLM has apparently not, however, posted on the TikTok account since winning the TRO. *See* Hayley Paige (@misshayleypaige), TikTok, https://www.tiktok.com/@misshayleypaige. And the description of the Pinterest account currently reads: "Hi, I'm Hayley Paige! I'm a designer, content creator, and podcast co-host." Hayley Paige (@misshayleypaige), Pinterest, https://www.pinterest.com/misshayleypaige.

Gutman moved for reconsideration and dissolution of the PI, which the district court denied on June 2, 2021. On appeal, Gutman raises several challenges to the PI and the denial of her motions to reconsider and to dissolve, including that

16

the district court erred in determining that she likely breached the Noncompete and Name-Rights Agreements, and that JLM's own breach of contract prohibits it from seeking injunctive relief. She also asserts that the Disputed Accounts are rightfully hers and that the district court erred in assigning control to JLM. [8]

## II. DISCUSSION

A.    <u>Standard of Review</u>

We review a district court's decision to deny or issue a preliminary injunction for abuse of discretion. *See Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). A district court has abused its discretion if it "(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Id.* (citation omitted). We review factual findings for clear error and conclusions of law de novo. *See id.*

---

[8] Gutman has raised certain counterclaims and is challenging a contempt order the district court issued against her in a separate proceeding. The district court also declined to reach some of JLM's requests for relief, finding them unripe. None of these issues is before the Court in this appeal.

17

B.      Noncompete Agreement

Gutman argues that the district court abused its discretion by entering paragraph 3(b) of the PI, which prevents her from competing with JLM through the end of the extended Term of the Contract (August 1, 2022). We disagree.

First, Gutman's argument is inconsistent with the plain terms of the Contract. Gutman argues that section 9(a) of the Contract—which prohibits her from competing with JLM "during the period of her employment" with JLM—no longer binds her because she has resigned. But the Contract provides that only JLM may terminate the Contract, not Gutman. *See JLM Couture*, 2021 WL 827749, at *9; *see also* Contract § 13 (providing JLM, but not Gutman, with termination rights). Gutman nevertheless argues that she is not "employed" within the meaning of the Contract both because of her decision to stop working and JLM's subsequent recognition of her as having "resigned," App'x at 2935. JLM counters that the phrase "during the period of her employment" is the same as the "Term" of the Contract—*i.e.*, the period running through August 1, 2022—and thus applies whether Gutman is working or not. In response to Gutman's claim that she has resigned, JLM represents that it remains "willing and able to perform" and that Gutman "can work for JLM as she agreed to do." Appellee Br. at 34.

18

We need not decide whether Gutman remains "employed" within the meaning of section 9(a) because she consented in any event to an injunction compelling her to comply with her contractual duties in the event of her breach. *See* Contract § 9(e). The district court determined that Gutman breached the Contract, and it reasoned that it could not order Gutman "to perform personal services" exclusively for JLM through August 1, 2022. *See JLM Couture*, 2021 WL 827749, at *9 (citing U.S. Const. amend. XIII). But the court did not abuse its discretion by providing a form of lesser-included relief—*i.e.*, preventing Gutman from competing with JLM for that same period, a restriction that would have bound Gutman if she had continued to work for JLM as contractually required. *See, e.g.*, *Am. Broad. Cos. v. Wolf* (*ABC*), 420 N.E.2d 363, 367 (N.Y. 1981) ("[W]here an employee refuses to render services to an employer in violation of an existing contract, and the services are unique or extraordinary, an injunction may issue to prevent the employee from furnishing those services to another person for the duration of the contract." (citing *Lumley v. Wagner* (1852) 42 Eng. Rep. 687; 1 De G.M.&G. 604)).

Second, the Noncompete Agreement appears to be enforceable under New York law. Gutman points to the general standard that "[a] restraint is reasonable

only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (emphasis omitted). But New York recognizes the availability of injunctive relief "where the non-compete covenant is found to be reasonable *and the employee's services are unique*." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999) (emphasis added). Here, Gutman does not meaningfully contest the district court's reliance on the fact that her services are "special, unique or extraordinary." *See id*. Further, the noncompete provision does not even extend beyond Gutman's contractual period of employment with JLM; it was triggered only because Gutman stopped working before the Term was complete. *See* Contract § 9(a); *ABC*, 420 N.E.2d at 367 (explaining that the "availability of equitable relief" is greatest "for the duration of the contract" where "the employee either expressly or by clear implication agreed not to work elsewhere"). Gutman provides no reason to question the district court's determination that this Noncompete Agreement was reasonable and fully enforceable in light of her unique role at JLM.

Third, we discern no error in the district court's finding that Gutman impermissibly competed with JLM and may have continued doing so absent an injunction. *See* App'x at 1197 (advertisement for a bridal expo listing Gutman in her capacity as a designer). It was also well within the district court's discretion to conclude that the PI is neither overbroad nor vague. In particular, the language barring Gutman from "indirectly . . . associat[ing] with . . . any person" engaging in the design of bridal wear or related goods is drawn directly from the Contract.[9] *See* Contract § 9(a).

In sum, Gutman has identified no abuse of discretion in the district court's order enforcing the noncompete provision, in effect through the end of her contractually agreed Term. We therefore affirm paragraph 3(b) of the PI.

C.    Name-Rights Agreement

Gutman next challenges the portions of the PI relating to the Name-Rights Agreement. *See* PI ¶¶ 3(a), 4, *supra*. She contends that the Contract grants JLM the right to use "Hayley Paige Gutman" and its derivatives (collectively, the "Designer's Name") in connection with only "such clothing or related items" that

_____

[9] Contrary to Gutman's claim that this language prohibits her from casual social contact with anyone in the industry, it is clear from the context in both the PI and the Contract that "association" here is used in the ordinary commercial sense of forming a business affiliation, and does not refer to mere social interaction.

Gutman "has substantially participated in . . . design[ing] or creat[ing] . . . during her employment." Contract § 10(a). But the very next subsection explicitly states otherwise:

> [Gutman] hereby irrevocably sells, assigns, and transfers all right, title and interest to [JLM] that now exists or may exist during the Term (and any extensions thereof) and for a period of two years thereafter, to register the Designer's Name or any derivatives(s) thereof as trademarks or service marks (the "Trademark" or "Trademarks") . . . . The Trademarks shall in perpetuity be the exclusive property of [JLM], [Gutman] having consented to it being filed by [JLM] and **[Gutman] shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce** during the Term or any time thereafter without the express written consent of [JLM].

Contract § 10(b) (emphasis added).

We decline Gutman's invitation to depart from the plain language of the Contract. First, Gutman argues that the Court should read "Designer's Name" to incorporate the other limitations of section 10(a). But "Designer's Name" is clearly defined in section 10(a) as "'Hayley,' 'Paige,' 'Hayley Paige Gutman,' 'Hayley Gutman,' 'Hayley Paige,' or any derivative thereof." *Id.* § 10(a) (punctuation cleaned up). The remaining conditions in section 10(a)—*i.e.*, a termination date and a limitation of the right to cover only goods Gutman helped design—are not part of the definition of "Designer's Name." Section 10(b) is thus in no way

22

ambiguous and clearly prohibits Gutman from "us[ing]" the "Designer's Name" (her name and its derivatives) "in trade or commerce." *Id.* § 10(b).

Second, Gutman suggests that we should read section 10(b) as purely a trademark provision. Implicitly invoking the canon of *noscitur a sociis*—that a word should be understood by the company it keeps, *see Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion)—Gutman proposes that we should understand the grant of rights in "Designer's Name" to be limited by those rights JLM has in the "Trademarks." As a threshold matter, we use this canon "to resolve ambiguity, not create it." *Id.* at 564 (Kagan, *J.*, dissenting). There is no ambiguity in a term that the Contract clearly defines. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (explaining that language is not "ambiguous where the interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning" (cleaned up)). In any event, the Contract transfers Gutman's rights in the "*Trademarks, Designer's Name* or any confusingly similar *marks or names*." Contract § 10(b) (emphasis added). The *noscitur* canon supports, rather than weakens, our understanding of the Contract's clearly defined meaning: "Trademarks" runs parallel to "marks," and "Designer's Name" runs parallel to "names." And if this were not clear enough, the next

subsection again reiterates that Gutman "assign[ed] to [JLM] . . . the Designer's Name *and* the Trademarks." *Id.* § 10(c) (emphasis added). Limiting the rights in Designer's Name to those in the Trademarks would render each of these repeated admonitions superfluous. *See Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183 (2d Cir. 2019) ("We must avoid an interpretation of an agreement that renders one of its provisions superfluous." (cleaned up)).

Finally, Gutman suggests that the district court's reading of section 10(b) would override section 10(a)'s proviso that Gutman grants JLM exclusive rights in the Designer's Name "in connection with" only bridal wear that Gutman designed. Contract § 10(a). Section 10(b)'s grant of full rights to the Designer's Name, Gutman argues, would render section 10(a) moot. But it is not correct that section 10(b) contradicts, overrides, or moots section 10(a). Section 10(a) grants a provisional right: It expires two years after Gutman's termination if JLM "has not sought to [r]egister the Designer's Name as a Trademark." Contract § 10(a). Section 10(b), in contrast, describes the rights that vest perpetually in JLM if it has in fact registered the Trademarks.[10] Those rights include the exclusive "use of . . .

---

[10] JLM exercised its right to register the "Hayley Paige" and related trademarks. *See* App'x at 479–508.

24

Designer's Name . . . in trade or commerce."[11]   The two subsections are thus complementary, not contradictory.

The district court did not err in concluding that this provision applies to any use of the Designer's Name in trade or commerce, and we affirm the court's decision to enforce the Name-Rights Agreement through the PI.[12]

D.   Social Media Accounts

Gutman also argues that the district court improperly awarded JLM exclusive control over the three Disputed Accounts.   In its complaint and PI motion, JLM raised claims of conversion and trespass to chattels based on Gutman's seizure of control over the Instagram, TikTok, and Pinterest accounts.

---

[11] Although we have stated in dicta that an agreement to sell the right to use one's own name must be "clearly shown," *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986) (citation omitted), the extent to which a party is barred from using her name ultimately "depends on the terms of the sale," *id*. at 823. *See also Levitt Corp. v. Levitt*, 593 F.2d 463, 468 (2d Cir. 1979) ("To protect the property interest of the purchaser, . . . the courts will be especially alert to foreclose attempts by the seller to 'keep for himself the essential thing he sold, and also keep the price he got for it.'" (quoting *Guth v. Guth Chocolate Co.*, 224 F. 932, 934 (4th Cir. 1915))).   Here, the PI does nothing more than recite the words of the Contract. *Compare* PI ¶ 3(a) ("using . . . the 'Designer's Name' . . . in trade or commerce"), *with* Contract § 10(b) ("use of . . . Designer's Name . . . in trade or commerce"); *see also id*. § 9(e) ("[Gutman] hereby consents to the granting of a temporary or permanent injunction against her . . . prohibiting her from violating any provision of [the Contract].").   This appeal thus does not call for us to opine on the precise scope of the prohibition against "us[ing]" the trade name "Hayley Paige Gutman" and its derivatives "in trade or commerce."

[12] We also reject Gutman's irreparable-harm and overbreadth arguments for the same reasons stated with respect to the Noncompete Agreement. *See supra* Section II.B.

25

JLM's proposed order listed eighteen social media accounts it sought to bar Gutman from accessing. JLM also singled out the three Disputed Accounts in a proposed paragraph ordering Gutman to transfer control of those accounts to JLM. The district court adopted both the account list and the paragraphs regarding control of the Disputed Accounts as proposed by JLM. Together, these portions of the PI grant unrestricted control over the Disputed Accounts to JLM and deny control to Gutman absent the company's approval: Gutman may not post on or attempt to access control of the Disputed Accounts, account control must be turned over to JLM, and JLM faces no restrictions on what it may do with the Disputed Accounts.[13] This portion of the PI does not expire on August 1, 2022, but lasts indefinitely throughout the litigation. On appeal, Gutman seeks relief only as to the Disputed Accounts, which are the three accounts the district court explicitly ordered Gutman to turn over to JLM.

JLM and Gutman agree that the Disputed Accounts are property belonging to one of them, but they disagree vigorously about whose accounts they are. JLM contends that Gutman created the Disputed Accounts in her capacity as an

---

[13] The one exception is that the district court entered an order limiting both parties' alterations of previously posted content (on both the Disputed Accounts and other undisputed accounts) to preserve evidence. *See* No. 20-cv-10575, Dkt. 238 (S.D.N.Y. Sept. 13, 2021).

26

employee, that they are therefore owned by the company, and that JLM merely gave Gutman wide discretion as its agent to operate the accounts as she saw fit. In contrast, Gutman argues that she created the Disputed Accounts in her personal capacity, that JLM did not acquire them simply by virtue of investing in the Hayley Paige brand, and that she did not cede ownership to JLM by agreeing to use her accounts to market Hayley Paige products or by occasionally giving other JLM employees direct access when it was in her interest to do so. The parties also disagree about who had ultimate authority over posts, whether any such authority derived from ownership or from some power or duty under the Contract, whether either party recognized the other as the Accounts' true owner during their course of dealing, the extent to which JLM was responsible for the growth of the Disputed Accounts, and which of these factors matter for identifying the Disputed Accounts' true owner.

In the end, the district court "decline[d] to address [JLM]'s conversion [and] trespass to chattel" claims or to evaluate "the somewhat more nuanced issue of 'ownership' of the [Instagram] Account itself." *JLM Couture*, 2021 WL 827749, at *19. But the court nonetheless granted JLM control over all three Disputed Accounts and entered this part of its proposed PI nearly verbatim, *compare JLM*

27

*Couture*, 2021 WL 827749, at \*23–24, *with* No. 20-cv-10575, Dkt. 86 (Proposed Order), at 2–3, 5, even though the court did not address the predicate question of who likely owns them. It is thus unclear on what basis the district court excluded Gutman from using the Disputed Accounts and granted total control to JLM.

The Contract provides only that Gutman has consented to an injunction, in the event of her breach, "prohibiting her from violating any provision of [the Contract]." Contract § 9(e). We conclude that the breaches identified by the district court are insufficient by themselves to justify the relief it granted regarding control of the Disputed Accounts. First, the district court determined that Gutman breached her duty under section 2 of the Contract to assist with company advertising by refusing to post JLM's content on the Instagram account. *JLM Couture*, 2021 WL 827749, at \*12. Second, the court reasoned that much of the Instagram "[a]ccount content" is JLM's intellectual property under section 11 of the Contract, which gives JLM ownership over Gutman's creations while employed by the company. *Id.* at \*13. Third, the court ruled that Gutman's use of the "@misshayleypaige" account handle on Instagram in trade or commerce violated the Name-Rights Agreement. *Id.* at \*14.

These contractual breaches identified by the district court do not correspond to the injunctive relief JLM sought, which was clearly structured to remedy JLM's conversion and trespass claims. Indeed, other parts of the PI already prohibit Gutman from using the "@misshayleypaige" account name, PI ¶ 3(a), as well as any "Designs" posted to the Accounts, PI ¶ 3(c), in trade or commerce.[14] And even if we assume that the district court could enter some sort of injunction to address Gutman's alleged failure to "assist[] with advertising programs" during the pledged Term, Contract § 2, the PI would still be overbroad. First, unlike other parts of the PI, this provision does not expire on August 1, 2022. Second, the PI does not limit the purposes for which JLM can use the Disputed Accounts to only those under Gutman's contractual duties—so JLM could just as easily use the Disputed Accounts to enter into its own agreements promoting third-party products or even to comment on this litigation. Third, the PI denies Gutman the

---

[14] As Gutman acknowledges, should she defeat only the conversion and trespass claims, in order to use the Disputed Accounts in trade or commerce without violating the rest of the PI, she would likely have to take down the Designs owned by JLM and change the handle or username of the Disputed Accounts. *See* Appellant Br. at 46 n.5 (citing *BBC Grp. NV LLC. v. Island Life. Rest. Grp. LLC*, 475 F. Supp. 3d 1235, 1241 (W.D. Wash. 2020)). But even if the district court did not grant injunctive relief to assign the Disputed Accounts to JLM, with appropriate findings, it could impose other constraints at the PI stage on Gutman's use of the Accounts in order to prevent irreparable harm with respect to the Accounts.

29

right to post even personal content on the accounts without JLM's permission, and it nowhere limits JLM's discretion in withholding that permission.

The overbreadth of this part of the PI reflects the fact that the character of the district court's relief—a grant of perpetual, unrestricted, and exclusive control throughout the litigation—sounds in property, not in contract. Yet the district court disclaimed any effort to ground the PI on its evaluation of the ownership question, and we see no way to salvage the PI as written under JLM's alternative, Contract-based theories. The Contract allows injunctions only to enforce its own terms. *See* Contract § 9(e).[15] And a preliminary injunction may never be awarded

---

[15] Judge Lynch would affirm this part of the PI, at least as it applies to the Instagram account, with the concession that the PI might be modified to revert partial control to Gutman. Such slimmed-down relief would in the dissent's view be an equitable means of "restor[ing] . . . the account to the manner in which [it was] operated before Gutman unilaterally seized exclusive control." Dissent at 2. But even if we were to follow the general principles of equitable remedies, rather than the Contract's own language about injunctive relief, Contract § 9(e), we could endorse only a PI that aimed to protect JLM's *rights*, not one entrenching any pre-breach benefits JLM may have enjoyed from Gutman as a matter of grace. *See Babb v. Wilkie*, 140 S. Ct. 1168, 1178 (2020) ("Remedies generally seek to place the victim of a legal wrong in the position that person would have occupied if the wrong had not occurred. . . . Remedies should not put a plaintiff in a more favorable position than he or she would have enjoyed absent [the wrong]." (cleaned up)). The dissent thus elides the crucial question of what right, if any, underlay JLM's access to the Instagram account prior to this dispute. And for the reasons explained above, JLM's current answer to that question—Contract rights—is a revisionist reading of its proposed PI that cannot justify the scope of the district court's relief under ordinary equitable principles. *See supra* at 29–30; *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) ("It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation . . . .").

30

as a matter of right.[16] *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Further, the district court erred in assuming that its analysis of the Instagram account necessarily controlled the disposition of all three Disputed Accounts or all eighteen accounts listed in the PI. In fact, it is unclear how the eighteen accounts were chosen in the first place. *See* Spec. App'x at 56; *accord* No. 20-cv-10575, Dkt. 86, Ex. 1 (JLM's proposed account list). If the criteria for inclusion were simply whether the name of an account is under the Designer's Name, JLM's list would seem to be underinclusive: In addition to the disputed Instagram, TikTok, and Pinterest accounts, Gutman claimed to own several personal accounts not included in JLM's list, all with "Miss Hayley Paige" as the handle, web address, or username. *See* App'x at 2277–78. Gutman's list notably includes two accounts (on Snapchat and Spotify) that were created after Gutman

---

[16] Moreover, mandatory injunctions compelling affirmative action rather than merely prohibiting certain conduct must meet a higher standard. "A mandatory injunction . . . alter[s] the status quo by commanding some positive act . . . [and] should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (cleaned up). As the district court acknowledged, this part of the PI is mandatory in that it singles out the Disputed Accounts and compels Gutman to provide JLM the access credentials. *See JLM Couture*, 2021 WL 827749, at *24. And in its attempt to restore JLM's asserted rights, the PI alters the status quo of the year prior to suit, during which Gutman had exclusive access to at least the Instagram account.

31

began working for JLM but over which JLM did not seek an injunction.[17] Meanwhile, if the criteria involved considerations of how the accounts were created, used, or managed, those factors would seem to differ substantially even among the accounts in Gutman's control just prior to suit, *i.e.*, the Disputed Accounts. *See, e.g.*, App'x at 464–65 (discussing the creation and use of the TikTok account). It is not clear from the record what is significant about the eighteen accounts or the three Disputed Accounts other than the fact that JLM claims to own them—a claim that Gutman vigorously contests. In sum, the district court exceeded its discretion by issuing a PI transferring control over all three Disputed Accounts based on reasons specific to only one of them while expressing no opinion on who actually owns any of the accounts.

We do not attempt to decide for the first time on appeal—without full argument from the parties—the correct framework for answering who owns the Disputed Accounts or what result that framework would dictate. On remand, the district court could choose to answer directly the question of JLM's likelihood of

---

[17] The Instagram account bio referred to the Snapchat account at least at one point. *See* App'x at 1115.

JLM also has separate, seemingly analogous accounts on some of the same platforms as the Miss Hayley Paige accounts. *See* Spec. App'x at 56 (including "hayleypaige_jlm" on Twitter, "HayleyPaigeBridal" on Facebook, and "hayleypaigejlm" on Pinterest).

success on the merits of its conversion and trespass claims, properly weigh the relevant injunction factors, and grant or deny injunctive relief accordingly. Alternatively, the court may prefer to decide that the balance of equities favors denying any property-based injunction and thereby avoid the merits question, leaving Gutman in control of the Disputed Accounts (subject to the strict conditions of the remainder of the injunction). Finally, the district court may choose to modify the vacated portion of the injunction to provide JLM with relief for JLM's breach-of-contract claims that stems from Gutman's obligations under the Contract.[18] In any event, we conclude that the district court exceeded its discretion by effectively assigning valuable assets to JLM without first determining whether the company likely owns them. We therefore vacate the portion of the PI concerning the Disputed Accounts and remand for further analysis and clarification.

---

[18] For the same reasons as those explained regarding the Name-Rights Agreement, which prohibits more conduct than the agreement with respect to the Trademarks, *see supra* Section II.C, we also do not see how JLM's trademark claims could warrant a transfer of the Disputed Accounts. *See* 15 U.S.C. § 1116(a) (permitting injunctions under the Lanham Act "according to the principles of equity . . . to prevent the violation of any right of the registrant of a mark"); *supra* note 14 (explaining Gutman's concession about how such rights could be protected without a reassignment of her property should she succeed in defeating only the conversion and trespass claims); PI ¶ 3(a) (prohibiting use of the Trademarks and Designer's Name in trade or commerce). We do not exclude the possibility of other relief, with appropriate findings, that is properly tethered to remedy past trademark violations. *See Forschner Grp.*, 124 F.3d at 406.

33

E.    JLM's Alleged Breach

Finally, Gutman argues that JLM breached the Contract by refusing to pay her after she announced her resignation. Gutman asserts that this breach precludes JLM from seeking injunctive relief. *See Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 398 (S.D.N.Y. 2000) (noting that a party cannot "avoid its obligations under the contract and yet continue to reap the benefits").

As the district court recognized, however, Gutman (1) had no right to terminate the Contract unilaterally absent a breach by JLM, and (2) made no showing that JLM's failure to pay her constituted a likely breach of the Contract. The Contract states that "[f]or the full, prompt and faithful performance of all the duties and services to be performed by [Gutman] hereunder, [JLM] agrees to pay, and [Gutman] agrees to accept, the amounts set forth" as base and additional compensation. Contract § 4. Faithful performance is thus a condition precedent to payment of base and additional compensation, so JLM had no duty to pay Gutman if she did not work.[19] *See* Restatement (Second) of Contracts § 225(1)

---

[19] Gutman belatedly argues that some of her additional compensation is tied to revenues from before her announced resignation, and that her failure to perform thus does not excuse JLM's nonpayment at least as to those payments. We do not address this argument, as Gutman did not meaningfully challenge until her reply brief the district court's rationale that she failed to perform a condition of the Contract. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de*

34

("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused."). If there was no obligation for JLM to pay, there was no breach. The district court therefore did not abuse its discretion in concluding at this stage that JLM's failure to pay Gutman did not constitute a breach of the Contract.

## III. CONCLUSION

Gutman signed away several of her rights to JLM, but she never forfeited her right to keep property that is legally hers. The district court may well determine that some or all of the Disputed Accounts do not belong to Gutman, or that additional relief is nevertheless appropriate. But absent such determinations, JLM may not assert exclusive dominion over accounts Gutman controlled at the time suit commenced.

For the reasons set forth above, we **VACATE** paragraphs 1 and 2 of the PI, as well as the paragraph ordering Gutman to provide JLM with control of the Disputed Accounts; **AFFIRM** the remainder of the PI; and **REMAND** the case for further proceedings consistent with this opinion.

---

*C.V.*, 412 F.3d 418, 428 (2d Cir. 2005); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). We thus also do not consider JLM's alternative arguments regarding whether any nonpayment based on pre-resignation revenues would constitute breach or otherwise affect JLM's right to seek injunctive relief.

35

Jon O. Newman, *Circuit Judge*, concurring in part and dissenting in part:

A person's name is a valuable possession.[1] Broadly prohibiting its use is an extraordinary step that a court should not take except in the unlikely event that a person has clearly given someone else the right to obtain such a prohibition. In this case, I concur only in part because I cannot approve that portion of the District Court's preliminary injunction that prohibits Hayley Gutman from making any use of her own name in trade or commerce.

Gutman gave JLM Couture, her former employer, for a limited time, an exclusive limited license to use her name on clothing "provided [Gutman] has substantially participated in the design or creation of such clothing or related items during her employment." Employment Contract, § 10(a). Now that she has breached her employment contract, the District Court was entitled to prohibit her from using her name in

---

[1] "He that filches from me my good name robs me of that which enriches him and makes me poor indeed." WILLIAM SHAKESPEARE, OTHELLO, Act III, Scene 3.

marketing bridal wear that she helped design, a use that would violate the exclusive license she gave her former employer.

However, the preliminary injunction now on appeal goes much further than that and prohibits Gutman from using her name in trade or commerce, *i.e.*, on *any* product. In my view, her former employer has no right to such a sweeping prohibition on Gutman's use of her name.

The District Court and now this Court find authority for this sweeping extension of subsection 10(a) in subsection 10(b) of Gutman's employment contract. Subsection 10(b) contains two relevant sentences. The first provides: "The Employer hereby irrevocably . . . assigns . . . all right . . . to register the Designer's Name or any derivatives(s) thereof as trademarks." The second provides: "[T]he Employee . . . shall have no right to the use of the Trademarks, Designer's Name or any confusingly similar marks or names in trade or commerce . . . without the . . . consent of the Company."

The first sentence of subsection 10(b) does not authorize a broad prohibition against Gutman's use of her name. That sentence gives JLM Couture only the right to register Gutman's name or derivatives "as trademarks." It does not prohibit her

from making a nontrademark use of her name, such as putting her name on a website that informs the public that she has products or services to sell having nothing to do with bridal wear.

There are three reasons why the second sentence of subsection 10(b) also does not authorize a broad prohibition of Gutman's use of her name. First, because subsection 10(b) is a trademark provision, not only the first sentence but also the subsection as a whole should not be construed to do more than limit Gutman's use of her name as a trademark. "A writing is interpreted as a whole." Restatement of Contracts, § 202(2).

Second, although the second sentence itself contains a phrase that purports to prohibit Gutman from using "Designer's Name" in trade or commerce, that phrase continues with "or any confusingly similar marks or names." "Confusingly similar" is the language of trademark law, and the sentence, fairly construed, means that Gutman cannot use her name or a confusingly similar mark or a confusingly similar name *as a trademark*.

Third, the "Designer's Name" that JLM Couture can prohibit Gutman from using is only the name to the extent the company has been given a license to use it pursuant to subsection 10(a). "[A]ll writings that are part of the same transaction

3

are interpreted together." *Id.* The only use of the name "Gutman" that JLM Couture can use, or can prevent Gutman from using, is the name the company acquired with respect to bridal wear that she helped design or create. For any one of these reasons, subsection 10(b) does not support the sweeping prohibition against Gutman's use of her name.[2]

A prohibition on using one's name must be clear. *See Madrigal Audio Laboratories v. Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986) (citation omitted). A prohibition on using one's name "as trademarks," contained in a subsection concerned with trademarks, is surely not a clear prohibition on using the name for nontrademark purposes. And a limited prohibition in a trademark subsection should not be broadly interpreted to override a specific limitation in a provision licensing use of a name in another subsection of the same contract.

For these reasons, I concur in part and, to the extent indicated above, respectfully dissent in part.

---

[2] Subsection 10(c), which the Court quotes as saying that Gutman "assign[ed] to [JLM] . . . the Designer's Name and the Trademarks," Maj. Op. at 9 (brackets and ellipsis in original), refers to "the assignment," obviously meaning the limited assignment in subsection 10(a). Subsection 10(c) entitles Gutman to some additional compensation for making "the assignment." The additional compensation is not, as the Court says, "for assigning the Designer's Name and Trademarks to JLM," Maj. Op. at 10; the additional compensation is for making only the limited assignment of name in subsection 10(a).

GERARD E. LYNCH, *Circuit Judge*, concurring in part and dissenting in part:

I agree with the Court's affirmance of the preliminary injunction insofar as it bars Gutman from competing with JLM and from using the name "Hayley Paige Gutman" and its derivatives in trade or commerce, and I join fully in Parts II.A, B, C, and E of Judge Park's thoughtful and careful analysis of the issues. I write separately, however, because I disagree with Part II.D, and would also affirm paragraphs 1 and 2 of the preliminary injunction, at least insofar as they apply to the Instagram account.[1] I do not believe the district court erred in entering those portions of the injunction without determining the question of ownership.

Paragraph 1 of the preliminary injunction bars Gutman from "[m]aking any changes to any of the [Instagram] account[ ] . . . including but not limited to . . . posting any new content thereto and/or deleting or altering any content located therein . . . without the express written permission of Plaintiff's chief

---

[1] The parties' arguments as to the other social media accounts are not well developed. Their focus is on the three Disputed Accounts, and especially the Instagram account. Given that my view has not prevailed, I see no need to opine on whether the district court's injunction, which is being vacated in any event, is overbroad insofar as it relates to other social media accounts. I therefore confine my discussion to the Instagram account, which seems to be the main bone of contention between the parties, and as to which the record is most developed.

1

executive officer, Joseph L. Murphy" and directs Gutman to give JLM access credentials to the Instagram account, which she had unilaterally revoked in November 2019. *JLM Couture, Inc. v. Gutman*, No. 20-cv-10575, 2021 WL 827749, at \*23 (S.D.N.Y. Mar. 4, 2021). The majority considers these provisions tantamount to awarding ownership of the account, and thus as justifiable only on a finding, which the district court did not make, that JLM owns the account and is likely to prevail on its claims of conversion and trespass to chattels. Op. at 25-31.

I don't think that is so. The district court did not purport to give JLM control over the Instagram account because JLM is the account's rightful owner. Rather, the injunction was granted to restore the operation and control of the account to the manner in which they were operated before Gutman unilaterally seized exclusive control, pending resolution of the case. The district court's determination that JLM had shown a likelihood of success on its claims for breach of contract adequately justifies this type of injunctive relief.

As the district court found, and as this Court agrees, on July 13, 2011, Gutman granted JLM the exclusive world-wide right and license to use her name for certain purposes. It is undisputed that Gutman opened the @misshayleypaige

2

Instagram account on April 6, 2012, after she began her employment with JLM

and assigned rights to her name to JLM. Substantial record evidence supports the

district court's factual findings that (1) the Instagram account was created during

Gutman's employment with JLM and bears the name that she conveyed to JLM

for commercial use; (2) the account was used to promote JLM's business; and (3)

JLM not only retained considerable control over what Gutman posted, but also

had the ability to post material on its own, without her being able to veto what it

posted. In short, throughout her employment with JLM, Gutman collaborated

with JLM to operate the account, and while Gutman had primary access to the

account, JLM employees also had access, and JLM had final approval over

content generated to the account.

The district court's injunction essentially returns the parties – and the

Instagram account – to the position they were in prior to Gutman's breach.[2]

Using a preliminary injunction to restore parties to the pre-breach status quo,

---

[2] For the same reasons I do not address the other social media accounts, I do not
elaborate on the possibility that the injunction as written could be modified on appeal to
better reflect the *joint* management and control of the Instagram account that existed
before Gutman's breach, or the extent to which the turnover of exclusive control to JLM
might be justified by the impracticability of having the parties jointly operate the
account given their present contentious relationship.

3

upon a finding that the plaintiff has shown a substantial likelihood of success on her claim for breach of contract, is an uncontroversial provisional equitable remedy. A finding of ownership is not a prerequisite to the district court's equitable solution, which is proportionate to and justified by Gutman's breach. I therefore cannot conclude that the district court abused its discretion in requiring Gutman to undo her seizure of unilateral control over the Instagram account, and I respectfully dissent from the judgment of the Court to the extent it vacates that portion of the preliminary injunction.