# United States Court of Appeals
# for the Second Circuit

August Term 2021
Argued: March 31, 2022
Decided: September 15, 2022

Nos. 21-400, 21-403

ALEX CANTERO,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

v.

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

SAUL R. HYMES, ILANA HARWAYNE-GIDANSKY,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellees,*

v.

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of New York

Before:  LIVINGSTON, *Chief Judge*, and PARK and PÉREZ, *Circuit Judges*.

Plaintiffs in these two putative class actions took out home mortgage loans from Bank of America, N.A. ("BOA"), one before and the other after the effective date of certain provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). The loan agreements, which were governed by the laws of New York, required Plaintiffs to deposit money in escrow accounts for property taxes and insurance payments for each mortgaged property. When BOA paid no interest on the escrowed amounts, Plaintiffs sued for breach of contract, claiming that they were entitled to interest under New York General Obligations Law § 5-601, which sets a minimum 2% interest rate on mortgage escrow accounts. BOA moved to dismiss on the ground that GOL § 5-601 does not apply to mortgage loans made by federally chartered banks because, as applied to such banks, it is preempted by the National Bank Act of 1864 ("NBA"). The district court (Mauskopf, *J.*) disagreed and denied the motion, but this was error. We hold that (1) New York's interest-on-escrow law is preempted by the NBA under the "ordinary legal principles of pre-emption," *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 37 (1996), and (2) the Dodd-Frank Act does not change this analysis. GOL § 5-601 thus did not require BOA to pay a minimum rate of interest, and Plaintiffs have alleged no facts supporting a claim that interest is due. The district court's order is **REVERSED** and the cases are **REMANDED** for further proceedings consistent with this opinion.

Judge Pérez concurs in a separate opinion.

MARK W. MOSIER, Covington & Burling LLP, Washington, DC (Andrew Soukup, Laura Dolbow, Covington & Burling LLP, Washington, DC; Thomas M. Hefferon, Goodwin Procter LLP, Washington, DC, *on the brief*), *for Defendant-Appellant*.

2

JONATHAN E. TAYLOR, Gupta Wessler PLLC, Washington, DC (Matthew W.H. Wessler, Gupta Wessler PLLC, Washington, DC; Jonathan M. Streisfeld, Kopelowitz Ostrow Ferguson Weiselberg Gilbert, Ft. Lauderdale, FL; Hassan Zavareei, Anna C. Haac, Tycko & Zavareei LLP, Washington, DC; Todd S. Garber, Finkelstein, Bankinship, Frei-Pearson & Garber, LLP, White Plains, NY, *on the brief*), *for Plaintiff-Appellee Alex Cantero.*

Mark C. Rifkin, Daniel W. Krasner, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, *for Plaintiffs-Appellees Saul R. Hymes and Ilana Harwayne-Gidansky.*

Benjamin W. McDonough, Bao Nguyen, Gregory F. Taylor, Peter C. Koch, Gabriel A. Hindin, Michael K. Morelli, Office of the Comptroller of the Currency, Washington, DC, *for Amicus Curiae Office of the Comptroller of the Currency in Support of Defendant-Appellant.*

H. Rodgin Cohen, Matthew A. Schwartz, Helen F. Andrews, Sullivan & Cromwell LLP, New York, NY; Gregg L. Rozansky, The Bank Policy Institute, Washington, DC; Daryl Joseffer, Paul V. Lettow, U.S. Chamber Litigation Center, Washington, DC; David Pommerehn, Consumer Bankers Association, Washington, DC; Thomas Pinder, The American Bankers Association, Washington, DC, *for Amici Curiae The Bank Policy Institute, American Bankers Association, Consumer Bankers Association, and Chamber of Commerce of the United States of America in Support of Defendant-Appellant.*

---

PARK, *Circuit Judge*:

In February 1818, the Maryland General Assembly levied a tax of $15,000 per year on "all Banks or Branches thereof, in the State of Maryland, not chartered by the [state] Legislature." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 320 (1819). When the Second Bank of the United States—a federally chartered, majority privately owned bank—refused to pay, Maryland sued. Before the U.S. Supreme Court, the state argued that its modest tax merely "submitted" the bank "to the jurisdiction and laws of the State, in the same manner with other corporations and other property" and that it could be imposed "without ruining the institution, or destroying its national uses." *Id.* at 346. Chief Justice Marshall, writing for the Court, famously rejected this line of reasoning:

> We are not driven to the perplexing inquiry, so unfit for the judicial department, *what degree* of taxation is the legitimate use . . . .
>
> That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on [state] government[s] *a power to control* the constitutional measures of [the federal government], are propositions not to be denied.

*Id.* at 430–31 (emphasis added).

The question in these appeals is whether a New York law requiring mortgage lenders to pay a 2% minimum interest rate on mortgage escrow accounts applies to banks chartered by the federal government. As in *McCulloch*, Plaintiffs say that because the law requires payment of only a "modest amount of interest," Appellee's Br. at 35,[1] it may be applied, consistent with federal law, to national banks. But unlike in *McCulloch*, both the state and federal governments here have taken the position that New York's law is preempted. We agree. The minimum-interest requirement would exert control over a banking power granted by the federal government, so it would impermissibly interfere with national banks' exercise of that power. We thus hold that the law is preempted by the National Bank Act of 1864 ("NBA"), 12 U.S.C. § 21 *et seq.*, and we reverse the order of the district court concluding otherwise.

## I. BACKGROUND

A. <u>Statutory Framework</u>

1. *National Bank Act of 1864*

The Civil War Congress enacted the NBA "to facilitate . . . a national banking system." *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315 (1978) (cleaned up). A replacement for the bank-chartering regime at issue in *McCulloch*, the NBA enabled the federal government to issue bank charters and thereby introduced a "dual banking system" that is "still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10, 15 n.7 (2007);

---

[1] The parties submitted nearly identical briefing in these two appeals. Unless otherwise noted, brief and appendix citations are to the filings in the lead case, *Cantero*, 21-400.

*see id.* at 11; *see also* Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 3–8 (1977).   Under this system, "both federal and state governments are empowered to charter banks and to regulate the banks holding their respective charters."   *Lacewell v. OCC*, 999 F.3d 130, 135 (2d Cir. 2021).   Banks may seek a charter from either the state or federal government, and both state and national banks are able to compete—under the constraints of their respective regimes—for consumer business.   *Id.*

While state banks are organized under state law, "[n]ational banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States."   *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896).   The NBA grants national banks broad powers, functioning as "a complete system for the establishment and government of national banks."   *Cook Cnty. Nat'l Bank v. United States*, 107 U.S. 445, 448 (1883).   These include certain enumerated powers as well as "all such incidental powers as shall be necessary to carry on the business of banking."   12 U.S.C. § 24 (Seventh); *see Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 41 n.4 (2d Cir. 2014) (interpreting this grant as conferring the power to engage in "activities convenient and useful in connection with the performance of an express power" (cleaned up)).

One such enumerated power is the power to "make, arrange, purchase or sell loans . . . secured by liens on interests in real estate." 12 U.S.C. § 371(a).   The district court recognized, and no party disputes, that banks have the incidental "power to provide escrow services" in connection with home mortgage loans.   *Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 193 (E.D.N.Y. 2019).   As the Office of

6

the Comptroller of the Currency ("OCC") has explained, "tax and insurance escrow accounts" affiliated with home mortgage loans are "an integral part of or a logical outgrowth of the lending function." OCC Conditional Approval No. 276, 1998 WL 363812, at *9 (May 8, 1998). Lenders use these accounts to require customers to make intermittent payments for property taxes and insurance premiums, ensuring fulfilment of these obligations while "reliev[ing] [mortgagors] of the tasks of paying such regular tax and insurance obligations in a lump sum." *Id.*

2. *Other Federal Statutes*

Among Congress's regulations of national banks are three statutory provisions discussed by the parties here. First, the Real Estate Settlement Procedures Act of 1974 ("RESPA"), 12 U.S.C. § 2601 *et seq.*, limits the amount banks may require borrowers to deposit in escrow accounts in connection with their home mortgages. Lenders who establish escrow accounts for property tax and insurance payments may not require borrowers to deposit more than is "sufficient to pay such taxes, insurance premiums and other charges." 12 U.S.C. § 2609(a)(1). This provision of RESPA does not mention a *rate of return* on the balance, but rather caps the *amount* that may be required to be contributed.

Second, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), codified a standard for when "State consumer financial laws" are preempted. *Id.* § 1044, 124 Stat. at 2015 (codified at 12 U.S.C. § 25b(b)(1)). Such laws are void if any of the following is true:

> (A) application of a State consumer financial law would
> have a *discriminatory effect on national banks*, in

comparison with the effect of the law on a bank chartered by that State;

(B) in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner, et al., 517 U.S. 25 (1996), the State consumer financial law *prevents or significantly interferes with the exercise by the national bank of its powers*; and any preemption determination under this subparagraph may be made by a court, or by regulation or order of the Comptroller of the Currency on a case-by-case basis, in accordance with applicable law; or

(C) the State consumer financial law is *preempted by a provision of Federal law other than title 62 of the Revised Statutes*.

*Id.* (emphases added).

Third, Dodd-Frank amended the Truth in Lending Act ("TILA") to add 15 U.S.C. § 1639d, which includes language implicating certain mortgage escrow accounts. *See* Dodd-Frank § 1461(a), 124 Stat. at 2178–81 (codified at 15 U.S.C. § 1639d). Section 1639d mandates the creation of escrow accounts for certain mortgages, and it provides that for those mandatory escrow accounts, "[i]f prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." 15 U.S.C. § 1639d(g)(3).

### 3. *N.Y. GOL § 5-601*

The state statute at issue in these appeals is New York General Obligations Law ("GOL") § 5-601, which provides that whenever a "mortgage investing institution . . . maintains an escrow account pursuant to any agreement executed in connection with a mortgage on" certain real estate, the institution "shall . . . credit the [account] with dividends or interest at a rate of not less than two per centum per year . . . or a rate prescribed by the superintendent of financial services."

In 2018, the New York Department of Financial Services changed the minimum rate under GOL § 5-601 for *state*-chartered banks to "the lesser of two percent or the six-month yield on United States Treasury securities." *Order Issued Under Section 12-a of the New York Banking Law*, N.Y. St. Dep't Fin. Servs. 2 (Jan. 19, 2018), https://www.dfs.ny.gov/system/files/documents/2020/03/wild_20180 119_mortgage-escrow_order.pdf ("2018 Order"). The state explained that the change was aimed at creating "parity" between state- and federal-chartered banks given that "national banks . . . [were able] to establish such escrow accounts without restriction as to the payment of interest." *Id.* at 1. The 2018 Order does not purport to apply to national banks.

### B. Factual Allegations

Plaintiff Alex Cantero purchased a house in Queens Village, New York, financed through a home mortgage loan from Bank of America, N.A. ("BOA"), on or about August 3, 2010. Cantero First

Amended Complaint ("Cantero FAC") ¶ 29.[2] Plaintiffs Saul Hymes and Ilana Harwayne-Gidansky (the "*Hymes* Plaintiffs") purchased a single-family home in East Setauket, New York, also financed through a BOA home mortgage loan, in May 2016. Hymes Compl. ¶ 13. Both mortgage loans required Plaintiffs to deposit money in escrow for property taxes and insurance premiums, and BOA paid no interest on either escrow balance. Cantero FAC ¶¶ 17, 19; Hymes Compl. ¶¶ 13–14.

Cantero's mortgage agreement states that it "shall be governed by Federal law and the law of the jurisdiction in which the [mortgaged property] is located," Cantero FAC ¶ 32, and Cantero alleges that BOA "systematically refuses to pay interest on funds held in escrow," *id.* ¶ 28. The *Hymes* Plaintiffs' mortgage agreement stipulates that it is "governed by federal law and the law of New York State" and also that BOA "will not be required to pay . . . any interest or earnings on the [e]scrow [f]unds unless . . . [a]pplicable [l]aw requires [BOA] to pay interest" on the funds. Hymes Compl. ¶ 43.

All agree that the two relevant provisions of Dodd-Frank—the codification of preemption standards and the TILA amendment— took effect after Cantero's mortgage was executed, but before the *Hymes* Plaintiffs' was.[3] Plaintiffs concede that Section 1639d (the

---

[2] We draw these facts from Plaintiffs' respective complaints, which we take as true at the motion to dismiss stage. *See Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 136 n.1 (2d Cir. 2022).

[3] The preemption-codification provision took effect on July 21, 2011. *See* Dodd-Frank § 1048, 124 Stat. at 2018 (effective on "designated transfer date"); *id.* § 1062, 124 Stat. at 2039–40 (delegating to the Secretary of the Treasury the power to set the designated transfer date); Designated Transfer Date, 75 Fed. Reg. 57,252 (Sept. 20, 2010) (designating July 21,

10

TILA amendment) does not apply to the mortgages at issue here. *See Hymes*, 408 F. Supp. 3d at 180 & n.5. And BOA does not dispute that Plaintiffs' mortgaged properties are the kind covered by GOL § 5-601 or that GOL § 5-601 is a "State consumer financial law" within the meaning of Dodd-Frank.

C.    Procedural History

Plaintiffs sued BOA for breach of contract, unjust enrichment, and related claims in two putative class actions in the Eastern District of New York. Their breach of contract claims, the only cause of action at issue on appeal,[4] turns on whether BOA was required by law to pay a minimum 2% interest rate to Plaintiffs. *See* Cantero FAC ¶ 32; Hymes Compl. ¶ 43. BOA moved to dismiss on the ground that GOL § 5-601 is preempted by the NBA.

The cases were decided together in a single order. The district court proceeded through several steps to "divin[e] congressional intent through regulations and statutory provisions." *Hymes*, 408 F. Supp. 3d at 184. First, the court determined that RESPA—which regulates the amount of money in, but not the interest rate accruing to, escrow accounts—shares a "unity of purpose" with GOL § 5-601. *Id.* at 185. That is relevant, the court reasoned, because Congress "intended mortgage escrow accounts, even those administered by

2011). And Dodd-Frank provided that the TILA amendment would take effect on the earlier of (a) the promulgation of an implementing rule or (b) eighteen months after the designated transfer date, which would be January 21, 2013. *See* Dodd-Frank § 1400(c)(2)–(3), 124 Stat. at 2136.

[4] Plaintiffs' other claims were dismissed for reasons not relevant here. *See Hymes*, 408 F. Supp. 3d at 199–201.

11

national banks, to be subject to some measure of consumer protection regulation." *Id.*

Second, the court turned to the TILA amendment, Section 1639d. "[A]lthough section 1639d(g)(3) does not govern the specific loans at issue in this case," the court said, "it is nonetheless significant, for it evinces a clear congressional purpose to subject *all* mortgage lenders to state escrow interest laws." *Id.* at 189 (emphasis in original). The section thus "giv[es] insight into Congress's intent." *Id.* at 190.[5]

Finally, the court considered the NBA itself. The court read *Barnett Bank*, 517 U.S. 25, along with prior Supreme Court case law interpreting the NBA's preemptive force, to require a finding of no preemption. It concluded that the "degree of interference" of GOL § 5-601 was "minimal" and was not a "practical abrogation of the banking power at issue." *Hymes*, 408 F. Supp. 3d at 195. It acknowledged that a "state escrow interest law setting punitively high rates could very well significantly interfere with national banks' power to administer escrow accounts." *Id.* at 196 (cleaned up). But the court stated that a different statute, Dodd-Frank's amendment to the TILA, "evinces a policy judgment that there is little incompatibility between requiring mortgage lenders to maintain escrow accounts and requiring them to pay a reasonable rate of interest on sums thereby received." *Id.* The court said it would "give effect to that judgment" by holding that GOL § 5-601 was not preempted by the NBA, and that this holding would allow the court

---

[5] The court also rejected BOA's arguments related to the preemptive effect of OCC regulations, a ground that we do not reach. *See id.* at 190–93.

to read the NBA and Section 1639d "harmoniously." *Id.* at 196, 198. The court thus denied BOA's motion to dismiss the breach of contract claim.

The court closely tracked the reasoning of the Ninth Circuit in a similar case involving a California interest-on-escrow law. *See Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185 (9th Cir. 2018). In *Lusnak*, the Ninth Circuit also relied on Section 1639d to conclude that California's law was not preempted (including even before Section 1639d was enacted). *See id.* at 1194–96. BOA, which was also the defendant in *Lusnak*, does not try to distinguish that case and argues instead that it was wrongly decided.

After the district court denied BOA's motion to dismiss, BOA moved to certify the preemption question for interlocutory appeal. The district court agreed that there was "substantial ground for difference of opinion" on the merits of its order and granted BOA's motion. *Hymes v. Bank of Am., N.A.*, No. 18-cv-2352, 2020 WL 9174972, at *4–6 (E.D.N.Y. Sept. 29, 2020); *see* 28 U.S.C. § 1292(b). We granted leave to appeal. Review of a district court's denial of dismissal for failure to state a claim, including based on preemption, is de novo. *Doe v. Hagenbeck*, 870 F.3d 36, 41–42 (2d Cir. 2017).

## II.   DISCUSSION

The district court attempted to resolve this case by—in its own words—"divining" the general legislative purpose of several different statutes. *Hymes*, 408 F. Supp. 3d at 184. The court determined that Congress subjected some types of loans to some types of consumer-protection laws, so there was "little incompatibility" between its objectives and enforcement of state-interest-on-escrow laws, and thus GOL § 5-601 was not preempted.

13

*Id.* at 196.   The court then applied its preemption determination—based primarily on provisions of the Dodd-Frank Act that have no retroactive effect—to Cantero's mortgage, which predated Dodd-Frank.   Finally, when the court looked to the NBA, it relied on an admittedly "limited sample of cases," *Hymes*, 2020 WL 9174972, at *4, even though *Barnett Bank* held that courts should apply long-established "ordinary legal principles of pre-emption," 517 U.S. at 37.

Although the district court correctly noted that in questions of preemption, "the guiding principle is the intent of Congress," *Hymes*, 408 F. Supp. 3d at 198, it erred by failing to employ the normal rules of statutory interpretation.   The district court should have read the plain language of the relevant statutes and applied the legal rules that those statutes have incorporated, rather than trying to extrapolate Congress's broader goals from various statutory provisions.

We reverse and hold as follows: First, the NBA preempts GOL § 5-601 under the "ordinary legal principles of pre-emption." *Barnett Bank*, 517 U.S. at 37.   That resolves *Cantero*.   Second, Dodd-Frank, to the extent it is relevant, merely codified those rules.   And that resolves *Hymes*.

A.     Ordinary Preemption Rules

1.     *Doctrinal Framework*

The Supremacy Clause provides: "[T]he Laws of the United States" made "in Pursuance" of the Constitution "shall be the supreme Law of the Land . . . [the] Laws of any State to the Contrary notwithstanding."   U.S. Const. art. VI, cl. 2.   Preemption doctrine concerns the question whether, as a matter of statutory interpretation, Congress has enacted a valid law to which a given state rule is "to the

14

Contrary." *See Barnett Bank*, 517 U.S. at 30 ("Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?").

Under "ordinary legal principles of pre-emption," we ask whether the federal and state provisions are in "irreconcilable conflict." *Id.* at 31, 37 (citation omitted). "If there be no conflict, the [NBA and a state law] can coexist, and be harmoniously enforced, but, if the conflict arises, the law of [the state] is from the nature of things inoperative and void as against the dominant authority of the Federal statute." *Davis*, 161 U.S. at 283; *see also Easton v. Iowa*, 188 U.S. 220, 232 (1903) ("[I]t is not our province to vindicate the policy of the [NBA], but to declare that it cannot be overridden by the policy of the State."); Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 266–72 (2000) (discussing *McCulloch*'s preemption analysis).

While the principles to be applied are ordinary, the NBA's preemptive force is not. The statute speaks in special terms that often trigger conflicts: When the NBA grants "powers," "both enumerated and incidental," those powers are "not normally limited by, but rather ordinarily pre-empt[], contrary state law." *Barnett Bank*, 517 U.S. at 32. In other words, Congress's grant of authority to a national bank under the NBA "does not condition federal permission upon that of the State." *Id.* at 35. Moreover, the presumption against preemption "disappears" in the NBA context. *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (citation omitted); *see also Watters*, 550 U.S. at 11 ("[F]ederal control shields national banking from unduly burdensome and duplicative state regulation.").

To be sure, national banks are routinely "subject to state laws

15

of general application in their daily business."  *Watters*, 550 U.S. at 11.  And those laws have full force "to the extent [they] do not conflict with the letter or the general purposes of the NBA."  *Id.*; *see also Nat'l Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 362 (1869) ("All their contracts are governed and construed by State laws.  Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law."); *see also Atherton v. FDIC*, 519 U.S. 213, 223 (1997) ("To point to a federal charter by itself shows no conflict . . . .").

2.    *Scope of NBA Preemption*

In *Barnett Bank*, the Court explained that Congress did not "deprive States of the power to regulate national banks, where . . . doing so does not prevent or significantly interfere with the national bank's exercise of its powers."  517 U.S. at 33.  The district court read "significantly interfere" to mean "practical[ly] abrogat[e]," and it looked to the "impact" and "degree of interference" to determine whether the state law at issue was preempted.  *Hymes*, 408 F. Supp. 3d at 194–95.  Plaintiffs similarly argue that state laws are preempted by the NBA only if they "prevent the exercise of a national bank's power [or] come close to doing so."  Appellee's Br. at 29.  And to make that determination, Plaintiffs urge us to look to the "degree of interference," which they claim is "minimal" here because the law requires payment of only a "modest amount of interest."  *Id.* at 34–35 (citation omitted).

We reject this approach.  *Barnett Bank* did not announce a new rule, but merely applied the "ordinary legal principles of pre-emption" to the state law at issue.  517 U.S. at 37.  Granted, after two centuries of applying those rules to the national-bank context, the

16

Supreme Court has used various formulations to describe when states impermissibly regulate national banks. *See, e.g.*, *Watters*, 550 U.S. at 13 ("curtail or hinder a national bank's efficient exercise of [a] power"); *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 659 (1924) ("frustrate the purpose for which the bank was created"); *McClellan v. Chipman*, 164 U.S. 347, 357 (1896) ("impair their efficiency to discharge the duties imposed upon them by the law of the United States"). But in an unbroken line of case law since *McCulloch*, the Court has made clear that the question is not how much a state law impacts a national bank, but rather whether it purports to "control" the exercise of its powers. *McCulloch*, 17 U.S. at 431; *see also United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (reading *McCulloch* as a "prohibit[ion] [on] States from interfering with or controlling the operations of the Federal Government"); *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875) ("States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit."); *Watters*, 550 U.S. at 11 (same); *Easton*, 188 U.S. at 230 ("[It] must be obvious that [national banks'] operations cannot be limited or controlled by state legislation . . . ."); *id.* at 238 ("Congress, having power to create a system of national banks, . . . has the sole power to regulate and control the exercise of their operations . . . ."). Control is not a question of the "degree" of the state law's effects on national banks, but rather of the kind of intrusion on the banking powers granted by the federal government. *McCulloch*, 17 U.S. at 430–31.

In other words, state laws with large impacts on a bank's revenue, business decisions, or bottom line may not be preempted, while regulations with modest impacts may be void. It is the nature of an invasion into a national bank's operations—not the magnitude

of its effects—that determines whether a state law purports to exercise control over a federally granted banking power and is thus preempted. Plaintiffs' contrary view would be inconsistent with Supreme Court precedent and binding principles of preemption, and it would also lead to untenable doctrinal implications.

a. Supreme Court Precedent and Background Principles

The Supreme Court has held that ordinary conflict preemption doctrine applies to NBA preemption cases. *See supra* at 17. Whether a state law is preempted is thus a question about the scope of the NBA—specifically, the extent to which it "set[s] aside the laws of a State." *Barnett Bank*, 517 U.S. at 30. And "the sound construction of the" NBA, like that of the national-banking scheme preceding it, is "that it exempts the trade of the [banks] . . . from the control of the States." *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 866 (1824).[6]

To determine whether the NBA conflicts with a state law, we ask whether enforcement of the law at issue would exert control over a banking power—and thus, if taken to its extreme, threaten to "destroy" the grant made by the federal government. *McCulloch*, 17 U.S. at 431. We do not endeavor to assess whether the degree of the

---

[6] The Court has expressly stated on multiple occasions that the NBA "rests on the same principle as the act creating the [S]econd [B]ank of the United States" and that "[t]he reasoning of . . . [*McCulloch*] and [*Osborn*]" applies with full force. *Farmers' & Mechs.' Nat'l Bank*, 91 U.S. at 33; *see also Easton*, 188 U.S. at 229 ("The principles enunciated in [*McCulloch*] and in [*Osborn*], though expressed in respect to banks incorporated directly by acts of Congress, are yet applicable to the later and present system of national banks.").

state law's impact on national banks would be sufficient to undermine that power.   *See id*.

The Court has articulated this principle in several different ways.   For example, it has held impermissible state laws that control a national bank's exercise of certain powers while at the same time endorsing the legality of other laws that could have an identical practical effect on the bank's profitability.   Most famously, in *McCulloch*, the Court noted that while Maryland could not tax the "operations of the bank," it could tax—without qualification as to how high the rate—the "real property of the bank" as well as "the interest which the citizens of Maryland may hold in [the] institution." 17 U.S. at 436; *see also Nat'l Bank*, 76 U.S. at 359 (distinguishing taxes "upon the shares of the stock of the bank" from taxes "upon the capital of the bank").   A state law with substantial consequences for banks may be valid under the NBA even while far less impactful state laws are void.   *See Nat'l Bank*, 76 U.S. at 362 ("[A] Federal officer . . . may be exempted from any personal service which interferes with the discharge of his official duties . . . [but] is liable to punishment for crime, though that punishment be imprisonment or death.   So of the banks.").

The Court has also explained that state laws exercising control over national banks—even if their own practical effect may be minimal—are invalid if, when aggregated with similar laws of other states, they would threaten to undermine a federal banking power. In *First National Bank of San Jose v. California*, 262 U.S. 366 (1923), the Court held that a California law escheating deposits in national banks that were dormant for 20 years was preempted.   Despite the lengthy period before a seizure could be effected, the Court explained that

"[i]f California may thus interfere other States may do likewise; and, instead of twenty years, varying limitations may be prescribed—three years, perhaps, or five, or ten, or fifteen. We cannot conclude that Congress intended to permit such results." *Id.* at 370. And in *McCulloch*, the Court was "not driven to the perplexing inquiry . . . what degree" of taxation would be "legitimate" rather than an "abuse" on the part of the state. 17 U.S. at 430. These cases make clear that the question is not whether a law's "degree of interference is minimal," *Hymes*, 408 F. Supp. 3d at 195, or "punitively high," *id.* (quoting *Lusnak*, 883 F.3d at 1195 n.7). Instead, we ask whether the kind of interference at issue could, taken as a whole, "destroy" the federal government's grant of a banking power. *McCulloch*, 17 U.S. at 431.

For example, in *Franklin National Bank of Franklin Square v. New York*, 347 U.S. 373 (1954), the Court held that a New York law barring national banks from using the word "savings" in advertising was preempted. The New York Court of Appeals had reasoned that the law was not preempted because it had no "seriously harmful effects" on the banks, which could easily adapt by using synonyms like "special interest account," "thrift account," and "compound interest account." *People v. Franklin Nat'l Bank of Franklin Square*, 113 N.E.2d 796, 799 (N.Y. 1953). The Supreme Court reversed. It concluded that the law was preempted because "the incidental powers granted to national banks" included "the use of advertising in any branch of their authorized business." *Franklin Nat'l Bank*, 347 U.S. at 377. It found "no indication that Congress intended to make this phase of national banking subject to local restrictions." *Id.* at 378. The

20

Supreme Court did not even address the magnitude of the impact of the law in concluding that New York's law was preempted.

Plaintiffs' reliance on *Anderson National Bank v. Luckett*, 321 U.S. 233 (1944), is misplaced. There, the Court held that a Kentucky escheat law for *abandoned* bank deposits was not preempted. But that law did not purport to regulate any bank power—it merely changed which parties could make a claim on a bank account as a background rule of property law. *See id.* at 249 ("A demand for payment of an account by one entitled to make the demand does not infringe or interfere with any authorized function of [a] bank."). The *Anderson* Court distinguished *First National Bank of San Jose*, the dormant-deposits case, by holding that there is a difference in kind between deposits that are merely deemed dormant (no matter how long) and those that are declared abandoned. *See id.* at 250. Laws escheating the latter were fine while those seizing the former were not, the Court explained, because for abandoned deposits, "[s]o long as . . . the power [was] exercised only to demand payment of the accounts in the same way and to the same extent that the [original] depositors could," it could "perceive no *danger of unlimited control* by the state over the operations of national banking institutions." *Id.* at 249 (emphasis added). With respect to dormant deposits, in contrast, the Court could draw no line on how many years of dormancy would render a state seizure permissible—"three years perhaps, or five, or ten, or fifteen"—and so such laws "would be incompatible with the statutory purposes of establishing a system of national banks acting as federal instrumentalities." *Id.* at 251 (citation omitted).

b. Doctrinal Implications

It bears noting that Plaintiffs' position would undermine the NBA's rationales as articulated by the Supreme Court. The Court has warned that "federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters*, 550 U.S. at 11. Indeed, Plaintiffs identify thirteen states with some kind of interest-on-escrow laws.[7] Those are in addition to RESPA, which imposes its own federal regulation on mortgage-escrow accounts. *See* 12 U.S.C. § 2609(a). It would undermine the NBA to subject national banks to a death-by-a-thousand-cuts regime of mortgage-escrow regulation. *See Easton*, 188 U.S. at 229 ("[The NBA] has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States."); *Talbott v. Bd. of Comm'rs*, 139 U.S. 438, 443 (1891) ("[T]he character of the system implies[] an intent to create a national banking system co-extensive with the territorial limits of the United States, and with uniform operation within those limits . . . .").

Plaintiffs' rule could also be overinclusive, deeming state laws having nothing to do with banking powers to be preempted by the NBA. As Plaintiffs argue, general "criminal, contract, or property laws . . . can have [more] significant consequences for the risk,

_____

[7] *See* Cantero FAC ¶ 79 (citing N.Y. Gen. Oblig. Law § 5-601; Conn. Gen. Stat. § 49-2a; Iowa Code § 524.905(2); Me. Rev. Stat. Ann. tit. 33, § 504; Md. Code Ann. Com. Law § 12-109; Mass. Gen. Laws ch. 183, § 61; Minn. Stat. Ann. § 47.20, subdiv. 9; N.H. Rev. Stat. Ann. § 384:16-a *et seq.* (amended requirement now at N.H. Stat. Rev. Ann. § 383-B:3-303(a)(7)(E)); Or. Rev. Stat. §§ 86.205, 86.245; 19 R.I. Gen. Laws § 19-9-2; Utah Code Ann. § 7-17-1 *et seq.*; Vt. Stat. Ann. tit. 8, § 10404; Wis. Stat. § 138.052).

pricing, and structure of a loan transaction" than laws controlling a banking power. Appellee's Br. at 22 (cleaned up). But that does not mean that such laws are preempted by the NBA merely because their impact on national banks is severe. *See Watters*, 550 U.S. at 11; *Nat'l Bank*, 76 U.S. at 362. Only laws purporting to control a national bank's exercise of its power are the kind of "possible unfriendly State legislation" covered by the NBA's preemptive force. *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. (18 Wall.) 409, 412 (1873).[8]

3. *Application*

In light of the foregoing, we conclude that GOL § 5-601 is preempted. The banking power at issue here is the power to create and fund escrow accounts. Like the regulation in *Franklin National*, GOL § 5-601 would target, curtail, and hinder a power granted to national banks by the federal government. By requiring a bank to pay its customers in order to exercise a banking power granted by the federal government, the law would exert control over banks' exercise of that power. And if taken to a greater degree, state authority to set minimum interest rates could infringe on national banks' power to

---

[8] Moreover, to implement Plaintiffs' rule, courts would become entangled in questions they are poorly suited to answer. If an interest rate of 2% were not significant interference, what rate would be sufficiently high? *Cf. First Nat'l Bank of San Jose*, 262 U.S. at 370; *see also* Brief of the Bank Policy Institute et al. as Amici Curiae at 17. The district court's order here is a case in point. If we were to consider the magnitude of the minimum rate New York has prescribed, we could not endorse the district court's unexplained conclusion that this rate was "modest." *Hymes*, 408 F. Supp. 3d at 185. Plaintiffs have not pleaded facts showing that 2% is in fact a "modest" rate of interest in this context, and indeed, Plaintiffs have offered no response to BOA's contention that this rate is far higher than the prevailing interest rates for the time period at issue.

use mortgage escrow accounts altogether. The issue is not whether this particular rate of 2% is so high that it undermines the use of such accounts, or even if it substantially impacts national banks' competitiveness. The power to set minimum rates is the "power to control," and the power to control is the "power to destroy." *McCulloch*, 17 U.S. at 431.

This conclusion is consistent with prior statements of the chief banking regulators of New York and of the United States. In 2004, the OCC promulgated an administrative rule purporting to preempt state interest-on-escrow laws. *See* Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1917 (Jan. 13, 2004) (codified at 12 C.F.R. § 34.4); *see also* Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. 43,549, 43,557 (July 21, 2011) (maintaining the rule after Dodd-Frank). We agree with the OCC that the district court "recognized [*Barnett Bank*'s] different linguistic formulations" only to "fashion[] [them] into what is for all practical purposes a new heightened standard." Brief of the OCC as Amicus Curiae at 7 (cleaned up). We also agree that laws like GOL § 5-601 would disrupt "fundamental and substantial elements of the business of national banks." Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. at 43,557.

Similarly, we are mindful of New York's 2018 Order, in which state regulators also agreed that GOL § 5-601 is preempted. Beginning in 2018, New York began to exempt state-chartered banks from the 2% interest requirement and instead require them to pay only the lesser of 2% and the six-month yield on U.S. treasuries. New York's chief financial regulator justified the change by stating

24

that GOL § 5-601 *did not apply* to national banks and so the change would help state banks remain competitive. If Plaintiffs' view were to prevail, this would have the odd consequence of making the 2018 Order illegal: State banks could avail themselves of a lower minimum interest rate than national banks could. *See* 12 U.S.C. § 25b(b)(1)(A) (establishing that state consumer financial laws are preempted if their "application . . . would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State").

We conclude that, under ordinary preemption rules, GOL § 5-601 is preempted. Thus, no interest is due to Plaintiffs under "federal law and the law of New York State," Hymes Compl. ¶ 43; *accord* Cantero FAC ¶ 32, and "the contract[s] [do] not commit [BOA] to pay interest to [Plaintiffs] on [these] mortgage escrow account[s]," *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005). This resolves *Cantero*; Plaintiff there failed to state a claim for breach of contract.

B.  Dodd-Frank Act

The mortgage loan in *Hymes* was executed after the effective date of certain provisions of the Dodd-Frank Act. All parties seem to agree that these provisions had no effect on the NBA's preemption standards, and so do we. But despite this concession, both sets of Plaintiffs nevertheless raise arguments based on Dodd-Frank. We conclude that all are meritless.

1.  *Preemption Standard*

Dodd-Frank provides that "State consumer financial laws" are preempted in three circumstances: (A) if they have a "discriminatory

effect on national banks" as opposed to state-chartered banks; (B) if "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in [*Barnett Bank*]," the law "prevents or significantly interferes with the exercise by the national bank of its powers"; or (C) if the law "is preempted by a provision of Federal law other than title 62 of the Revised Statutes." 12 U.S.C. § 25b(b)(1). At issue is whether GOL § 5-601 is preempted under subparagraph (B).[9] First, we conclude that subparagraph (B) did nothing more than codify the ordinary rules of preemption. Second, we reject Plaintiffs' arguments based on this statutory language.

a. Codification of the Ordinary Rules

Subparagraph (B) expressly codifies "the legal standard for preemption" in *Barnett Bank*. 12 U.S.C. § 25b(b)(1)(B). Congress thus expressly instructed us to do what we would have done anyway: Apply the "ordinary legal principles of pre-emption" that the Court has interpreted and applied before and since *Barnett Bank*. 517 U.S. at 37. Any ambiguity as to this point is removed by Congress's choice to cite *Barnett Bank* directly. Thus, subparagraph (B) did not change the preexisting legal standard, but rather explicitly codified it.

---

[9] For the first time in its reply brief, BOA argues that GOL § 5-601 is preempted under subparagraph (C) because 12 U.S.C. § 371 is "a provision of Federal law other than title 62 of the Revised Statutes." 12 U.S.C. § 25b(b)(1)(C); *see OCC Chief Counsel's Interpretation: 12 U.S.C. § 25b*, Off. Comptroller Currency 2 n.7 (Dec. 18, 2020), https://www.occ.gov/news-issuances/news-releases/2020/nr-occ-2020-176a.pdf. *See generally* 12 U.S.C. § 25b (referring four times to "title 62 of the Revised Statutes or section 371 of this title" and referring five times to only "title 62 of the Revised Statutes"). This argument is forfeited, and we do not address it. *See JLM Couture, Inc. v. Gutman*, 24 F.4th 785, 801 n.19 (2d Cir. 2022).

In applying this subparagraph of Dodd-Frank, we thus continue to refer to the longstanding preemption test articulated in cases going back to *McCulloch*.

### b. Plaintiffs' Arguments

Plaintiffs agree that Dodd-Frank codified *Barnett Bank*, but they nonetheless suggest that we should look to various features of other portions of the text of Dodd-Frank. This kind of reverse-engineering, however, makes little sense when Congress has codified a preexisting, judicially articulated rule. Congress codified this rule, so we can simply apply the test we have always used.

In any event, the text of the statute leads to the same result. Plaintiffs urge a close textual analysis of the phrase "significantly interferes"—language from Dodd-Frank parroting the Court's opinion in *Barnett Bank*. *See* 12 U.S.C. § 25b(b)(1)(B); *Barnett Bank*, 517 U.S. at 33. But when Congress "ha[s] before it the meaning" a case gave "to the words it selected . . . we give the language found . . . the meaning ascribed [to] it" by that case. *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). In turn, Plaintiffs' focus on the words "significantly interferes" in isolation is misguided because "the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022) (alteration in original) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). *Barnett Bank* was explicit that it was applying the "ordinary legal principles of pre-emption," not announcing a new standard. 517 U.S. at 37.

Even under Plaintiffs' interpretive approach, however, their arguments are unpersuasive. Plaintiffs assume that "significantly" must mean of high "degree." Appellee's Br. at 34 (citation omitted).

27

But although "significant" can mean "[f]airly large in amount or quantity," it can also mean "important" or "meaningful"—as in, interference is significant if it is important in relation to the banking power at issue. *Significant*, American Heritage Dictionary of the English Language (4th ed. 2000); *accord Significant*, American Heritage Dictionary of the English Language (5th ed. 2011). We agree with the OCC that this language is best interpreted, in light of ordinary preemption rules, as referring to laws that "*meaningfully* interfere with fundamental and substantial elements of the business of national banks and with their responsibilities to manage that business and those risks." Office of Thrift Supervision Integration; Dodd-Frank Act Implementation, 76 Fed. Reg. at 43,557 (emphasis added).

Plaintiffs' invocation of *noscitur a sociis* fares no better. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) (explaining that *noscitur* is the principle that "a word is known by the company it keeps"). Plaintiffs say that because "significantly interferes" is next to "prevents," it must mean "nearly prevent[s]." Appellee's Br. at 31. But if "significantly interferes" must be interpreted in conjunction with "prevents," it could just as easily mean that the state is similarly usurping control over federally granted powers to a federally created entity—not that the regulation is intrusive in degree or that it practically abrogates the power.[10]

---

[10] Applying the ordinary rules of preemption does not mean that all "State consumer financial laws" are preempted or that Congress has "occup[ied] the field." 12 U.S.C. § 25b(b)(1), (4). To the contrary, states are generally free to impose restrictions on the transactions engaged in by national banks, in common with those of other corporations doing business within the state. *See, e.g.*, *Nat'l Bank*, 76 U.S. at 362. It is only when state

2. *Truth in Lending Act Amendment*

The district court, following the Ninth Circuit in *Lusnak*, 883 F.3d at 1194–96, relied primarily on a statutory provision that has no relevance to this case. Dodd-Frank's amendment to the TILA required that for certain mortgage loans, lenders had to establish an escrow account. For these mortgages, "[i]f prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." 15 U.S.C. § 1639d(g)(3).

All agree that Section 1639d does not apply to Cantero's and the *Hymes* Plaintiffs' mortgage loans.[11] But the district court, like the Ninth Circuit in *Lusnak*, concluded that the TILA amendments somehow reflected Congress's judgment that all escrow accounts, before and after Dodd-Frank, must be subject to such state laws. That is incorrect.

First, the court improperly reasoned that Congress's decision to subject *some* escrow accounts to state interest-on-escrow laws "evince[d] a clear congressional purpose to subject *all* mortgage lenders to state escrow interest laws." *Hymes*, 408 F. Supp. 3d at 189

_____

laws control the exercise of powers granted to national banks that those laws conflict with the NBA.

[11] BOA contends that Section 1639d does not even subject covered mortgages to state interest-on-escrow laws, arguing instead that for a state law to be "applicable," it must already be not preempted. Appellant's Br. at 52. Like the concurrence, we read language saying that national banks are subject to state law "to mean what [it] say[s]." *Barnett Bank*, 517 U.S. at 34; Concurrence at 10. But we need not settle this question because Section 1639d has no relevance to this appeal.

(emphasis in original); *see also Lusnak*, 883 F.3d at 1196 (suggesting that Section 1639d reflects a more general judgment against preemption because it shows "Congress's view that creditors . . . can comply with state escrow interest laws without any significant interference with their banking powers"). The court correctly noted that preemption analysis is a question of congressional intent. But to assess congressional intent in the preemption context, we employ the ordinary rules of statutory interpretation. The district court's approach—to note certain exceptions granted by Congress, to infer from those a broader "intent" of Congress, and then to extrapolate further exceptions from there—is not an appropriate means of determining a statute's legal effect. *See Holy Trinity Church v. United States*, 143 U.S. 457 (1892) (applying similar reasoning); *United States v. Lucero*, 989 F.3d 1088, 1098 n.8 (9th Cir. 2021) (remarking that *Holy Trinity Church*'s approach has "long been disfavored"). To the contrary, the enumeration of only some exceptions typically implies the exclusion of others. *See Stow Mfg. Co. v. Comm'r*, 190 F.2d 723, 726 (2d Cir. 1951) (L. Hand, *J.*) ("That choice must have been deliberate: expressio unius, exclusio alterius."). Here, it is much more "harmonious[]" to read the NBA together with Dodd-Frank as a decision by Congress to carve out an exception from its general rule, rather than expressly imposing a burden on some mortgage loans in order to impliedly impose a burden on all of them. *Hymes*, 408 F. Supp. 3d at 198.[12] "Congress wrote the statute it wrote—meaning,

---

[12] For the same reasons, the district court's reliance on RESPA was misplaced. The fact that one purpose of RESPA is to protect mortgagors does not mean RESPA does so at all costs, endorsing all possible consumer-protection laws. Rather, Congress chose the approach in RESPA—*i.e.*, a cap on the amount that could be required to be put in escrow—*instead of*

30

a statute going so far and no further." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (cleaned up).

On this same point, Plaintiffs point to Dodd-Frank's legislative history. Although such consultation is unnecessary where the statutory language is clear, *see Milner v. Dep't of the Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it."), the legislative history here categorically contradicts Plaintiffs' view. The sponsors of Dodd-Frank noted that the new mandate to establish escrow accounts for certain mortgages was targeted at subprime borrowers in the wake of the 2008 Financial Crisis. *See* H.R. Rep. No. 111-94, at 49 (2009) (authored by Rep. Frank) ("Regarding the escrow provisions . . . [the bill] requires all subprime borrowers to have

---

requiring a floor on the rate of interest such proceeds can accrue. As we have explained:

> RESPA is meant to regulate the amount of money that a borrower is required to deposit in escrow by tying that amount to the costs the escrow fund is meant to secure. RESPA is not, however, designed to reduce the dollar costs of taxes, fees, and insurance premiums. RESPA can, and does, accomplish its task by setting rules on required escrow contributions. That this system may, in the end, be more expensive to borrowers than, say, keeping their money in interest-bearing accounts to pay their own bills, does not violate RESPA's stated goal of "reduc[ing] the amounts home buyers are required to place in escrow accounts." 12 U.S.C. § 2601(b)(3).

*Flagg,* 396 F.3d at 185. RESPA of course shares a partial "unity of purpose" with all mortgage-escrow regulations, but that does not mean that RESPA imposes all of them on national banks. *Hymes*, 408 F. Supp. 3d at 185.

accounts established in conjunction with their mortgages to provide protection against tax liens and the forced placement of insurance, among other things."); *id.* at 53 ("[S]ubprime borrowers, even though they are more likely to need budgeting assistance given their weaker credit histories, are less likely than prime borrowers to have escrows."). Having required a certain class of borrowers to open mortgage escrow accounts, it makes sense that Congress also allowed for interest-on-escrow balances to ensure that they would be adequately compensated. It does not make sense to read this provision as effecting a sub silentio sea change.

Second, Cantero's mortgage predated the TILA amendments, so the district court erred by looking to those amendments to determine the correct preemption standard in *Cantero*. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 117 (1980) (citation omitted). That is, the court erred by relying on what it thought Congress's intent was in 2010 to ascertain the legal force of the National Bank Act of 1864. The district court correctly acknowledged that Dodd-Frank did not change the preemption rules applicable here, but the next step should have been to look to those preemption rules—not to other contemporaneous provisions enacted by Dodd-Frank. By interpreting Dodd-Frank to determine the scope of preexisting preemption rules, the district court relied on the unstated assumption that Dodd-Frank advanced precisely the same purposes as the preemption standards that it left undisturbed. *See Hymes*, 408 F. Supp. 3d at 196 (seeking to "give effect to" Congress's latest "policy judgment"); *see also Lusnak*, 883 F.3d at 1197 (stating that the preemption test was the same before and after Dodd-Frank after having already used Dodd-Frank to determine whether the test was

32

met). But this assumption was in error. If anything, Congress's decision to carve out certain mortgages and to require banks to pay state-mandated interest on their associated escrow accounts would seem to reflect its understanding that such interest payments were not previously required. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect. . . . The reasonable construction is that the amendment was enacted as an exception, not just to state an already existing rule.").

In short, Dodd-Frank does not change the analysis applicable to this case, so the *Hymes* Plaintiffs have also failed to state a claim for breach of contract.

## III. CONCLUSION

When the NBA grants powers "both enumerated and incidental" to national banks, it displaces all state laws that purport to "control" banks' exercise of those powers. *Watters*, 550 U.S. at 11–12 (citation omitted). Although New York officials have said that the state's interest-on-escrow statute is one such preempted law, Plaintiffs contend otherwise. Their argument is that because the law's minimum interest rate is not very high, applying it to mortgage loans from institutions like BOA would not undermine the national uses to which Congress has put national banks. But in neither the NBA nor in Dodd-Frank did Congress direct us to answer a question "so unfit for the judicial department." *McCulloch*, 17 U.S. at 430.[13]

---

[13] BOA also argues that an OCC regulation promulgated under the NBA, 12 C.F.R. § 34.4, preempts GOL § 5-601. But "we hold that the NBA itself—independent of [the] OCC's regulation—preempts the application"

33

The order of the district court is reversed, and the cases are remanded for further proceedings consistent with this opinion.

---

of GOL § 5-601 to national banks, so we do not reach that question. *Watters*, 550 U.S. at 21 n.13.

21-400-cv, 21-403-cv
*Cantero v. Bank of Am., N.A.*

PÉREZ, *Circuit Judge*, concurring:

I join in full this Court's well-reasoned opinion and agree that to resolve these appeals we must apply the "ordinary" principles of conflict preemption and statutory interpretation. Maj. Op. at 15, 29–31. In accordance with binding precedent, this Court correctly holds that the New York law at issue is preempted by the National Bank Act ("NBA") because it significantly interferes with incidental national bank powers. *See Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 376, 378–79 (1954) (construing national banks' enumerated power to "receive deposits" broadly to include the incidental power to advertise such services).

I write separately, however, to address two points on why this Court's opinion leaves ample room for state regulation of national banks. First, states continue to have certain longstanding powers to regulate national banks consistent with the articulation of preemption doctrine in this case. This is because the opinion is rooted in the *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996) ("*Barnett Bank*") preemption standard, which only preempts state laws that directly conflict with enumerated or incidental national bank powers conferred by Congress. *Id.* at 32–34, 37. The standard is a narrow question of law

1

and preserves states' vital role in regulating national banks short of laws, like the New York law challenged here, that seek to "control" or otherwise prevent or significantly interfere with national bank powers. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11–12 (2007) (citation omitted).

Second, Congress has subjected national banks to state interest-on-escrow laws when financing certain mortgage loans that are, unlike Plaintiffs', covered by the Dodd-Frank Wall Street Reform and Consumer Protection Act's ("Dodd-Frank") amendments to the Truth in Lending Act ("TILA").[1] The majority has declined to reach this issue in these appeals, Maj. Op. at 29 n.11, but the plain text of the relevant statute compels the conclusion that Congress *did* intend to subject national banks to these state laws when financing certain mortgage loans covered

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1461, 124 Stat. 1376, 2178–81 (2010) (codified at 15 U.S.C. § 1639d).

by those amendments ("covered mortgage loan").[2]  *Id.* at 28–33.  Any argument to the contrary[3] is foreclosed by this Court's reasoning.

I.

Because this Court's opinion is rooted in ordinary conflict preemption principles in *Barnett Bank*, Maj. Op. at 15, it is consistent with longstanding case law that supports "the vital role that state legislation plays in the dual banking system."  *Watters*, 550 U.S. at 25 (Stevens, J., dissenting).  As this Court notes, these principles tell us that national banks, like any other corporation, are generally subject to the laws of the states in their business and affairs.  Maj. Op. at 28 n.10.

For over a century and a half, the Supreme Court has recognized this vital role states play in regulating federally chartered banks.  *See Watters*, 550 U.S. at 11

---

[2] To elaborate, a "covered mortgage loan," for the purposes of this opinion, is a loan made by a creditor that must include, in connection with its consummation, certain escrow requirements under 15 U.S.C. § 1639d—including the requirement to pay interest if prescribed by applicable state or federal law.  *Id.* § 1639d(b), (g).  Subsection (b) of that section sets forth the circumstances when a mortgage loan agreement must comply with these escrow requirements.  *Id.* § 1639d(b), (g).  Under that subsection, a covered mortgage loan includes a loan that is: (1) required to provide escrow services under "Federal or State law"; (2) "made, guaranteed, or insured by a State or Federal governmental lending or insuring agency"; (3) made with an original principal obligation amount that meets certain statutory formula based on the size of that amount, the "size of the property," and the "average prime offer rate"; or (4) required to provide escrow services "pursuant to regulation."  *Id.* § 1639d(b)(1)–(4).

[3] In these appeals, Bank of America, N.A. ("BOA") urged us to go further, arguing that Congress did not intend to subject national banks to state interest-on-escrow requirements under any circumstances.  *See* Appellant's Br. at 52; *see also Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018) (noting BOA's assertion of the same argument).

("Federally chartered banks are subject to state laws of general application in their daily business . . . ."); *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987) (applying state employment discrimination law to federally chartered savings and loan association); *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 306 U.S. 103 (1939) (applying state law tort claim by depositor against directors of a national bank); *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 290 (1896) ("Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks . . . ."); *Waite v. Dowley*, 94 U.S. 527, 533–34 (1876) (upholding state law requiring all banks, including national banks, to submit lists of shareholders as "not in conflict with any provision of the [NBA]"); *see also Atherton v. FDIC*, 519 U.S. 213, 223 (1997) (collecting cases in various contexts in which state law applied to federally chartered banks).

There is, of course, preemption of state laws that "infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *See Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 248 (1944) (collecting cases); *see also Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875) ("States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit."); *see also Nat'l*

*Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 362 (1869) ("It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional."). The Supreme Court in *Barnett Bank* distilled this century-and-a-half of case law into an "ordinary legal principle[]" holding that states have "the power to regulate national banks" where "doing so does not prevent or significantly interfere with the national bank's exercise of its powers." 517 U.S. at 33–34, 37.

The essential inquiry is one of conflict preemption which, in these appeals, requires an assessment of whether "[the state's] law stand[s] as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Id.* at 31 (alteration and internal quotation marks omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). We are to ask the narrow question of whether the state law directly conflicts with a national bank's exercise of an enumerated or incidental power conferred by Congress. *See, e.g., Franklin Nat'l Bank*, 347 U.S. at 377–78 (discussing incidental powers). If "the federal and state statutes are incompatible . . . the policy of the State must yield." *Id.* at 374.

This standard requires a finding of preemption in these appeals. As this Court notes, national banks have the incidental power to provide escrow services.

Maj. Op. at 23–24.  This power is derived from national banks' enumerated power to engage in real estate lending.  12 U.S.C. § 371 (real estate powers); *id.* § 24 (Seventh) (incidental powers).  Escrow services are incidental thereto because they are "convenient and useful in connection with the performance of" that power. *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 41 n.4 (2d Cir. 2014) (alterations and internal quotation marks omitted) (quoting *Sec. Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1044, 1049 (2d Cir. 1989)); *see also* BRUCE E. FOOTE, CONG. RSCH. SERV., 98-979, MORTGAGE ESCROW ACCOUNTS: AN ANALYSIS OF THE ISSUES 1 (1998) (discussing the widespread use of escrow accounts in mortgage lending).  The state law before us conflicts because it directly conditions the exercise of this power on the payment of interest to the accountholder, Maj. Op. at 23–24, a conclusion New York State's financial regulator has apparently conceded, *id.* at 9, 24 (citing a 2018 order of the New York State Department of Financial Services).

Of course, this conclusion does not imply that every state law that impacts national banks' business interests is preempted.  As this Court observes, such a course would have "untenable doctrinal implications," as many permissible state regulations on national banks impose "severe" impacts on such interests.  *Id.* at 18, 23; *see, e.g., First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 659 (1924) (state

statute "prohibiting [bank] branches, does not . . . interfere with the discharge of [national bank] duties" because no federal statute authorized national bank branches); *see also McClellan v. Chipman*, 164 U.S. 347, 361 (1896) (permitting state to enforce its prohibition on certain real estate transfers by insolvent transferees against a nationally chartered bank); *Madden v. Midland Funding, LLC*, 786 F.3d 246, 251 (2d Cir. 2015) (observing that state usury law at issue "might decrease the amount a national bank could charge for its consumer debt in certain states . . . [but] such an effect would not 'significantly interfere' with the exercise of a national bank power"); *Austin v. Altman*, 332 F.2d 273, 276 (2d Cir. 1964) (explaining that a case involving state claims by shareholders of national bank against bank directors for various alleged improprieties was not "a federal matter merely because the bank is chartered under federal law").

Because the state law at issue here conditions the exercise of an incidental power on the payment of monies to escrow accountholders—it is preempted. This conclusion nonetheless preserves states' vital role in our dual-banking system because the analysis asks whether the state law interferes with a congressionally granted national bank power.

## II.

Congress, however, has expressed its judgment that national banks must comply with state interest-on-escrow laws when financing certain mortgage loans that are, unlike Plaintiffs', covered by Dodd-Frank's amendments to TILA. *Supra* at 2 n.2. In these appeals, Bank of America, N.A. ("BOA") argued that Congress intended to exempt national banks from compliance with these state laws even when financing covered mortgage loans. Appellant's Br. at 52. This argument is contradicted by the text, foreclosed by this Court's reasoning, and would frustrate Congress's goals in addressing the subprime mortgage crisis.

To infer congressional intent "we employ the ordinary rules of statutory interpretation," Maj. Op. at 29–30, which tell us that "the best evidence of Congress's intent is the statutory text," *Nat'l Fed'n of Indep. Bus. V. Sebelius*, 567 U.S. 519, 544 (2012). We first "determine whether the [statutory] language at issue has a plain and unambiguous meaning." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If the statutory language is unambiguous, and the statutory scheme is coherent and consistent, the "inquiry must cease." *Id*. (citation omitted); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) ("[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one.").

The plain text of Dodd-Frank's amendments to the NBA and TILA reveal an intent to subject national banks to state interest-on-escrow laws when exercising real estate lending powers. With respect to the NBA amendments, this Court concludes that the text is best understood as Congress's "instruct[ion]" to "[a]pply the 'ordinary legal principles of pre-emption'" as articulated in *Barnett Bank*. Maj. Op. at 26 (quoting 517 U.S. at 37). With that unambiguous instruction, there was no need to "extrapolate Congress's broader goals" from amendments to TILA that did not apply to Plaintiffs' mortgage loans. *Id.* at 14. But this Court's analysis leads to another conclusion: these amendments reveal a congressional intent to require national banks to comply with state interest-on-escrow laws when financing covered mortgage loans. *See supra* at 2 n.2. The plain text requires "creditor[s]," without limitation for national banks, to pay interest on an escrow account "[i]f prescribed by applicable State or Federal law." 15 U.S.C. § 1639d(g)(3).

Dodd-Frank's dual instructions to apply *Barnett Bank* and comply with state interest-on-escrow laws are wholly consistent. In *Barnett Bank*, the Supreme Court tells us to infer a preemptive intent when the plain text of a statute "explicitly grants a national bank an authorization, permission, or power" with "no

'indication' that Congress intended to subject that power to [state] restriction." *Barnett Bank*, 517 U.S. at 34–35. But the Supreme Court also noted we do not infer preemptive intent when Congress provides an "explicit statement that the exercise of [national bank] power is subject to state law." *Id.* (collecting examples of such explicit statements); *Franklin Nat'l Bank*, 347 U.S. at 378 n.7 (same). In such circumstance, we are compelled to interpret the provision "to mean what [it] say[s]." *See Barnett Bank*, 517 U.S. at 33; *see also* Maj. Op. at 29 n.11. Congress made such an "explicit statement" by instructing national banks to comply with state interest-on-escrow laws when financing covered mortgage loans.

## A.

Dodd-Frank's requirement to comply with state interest-on-escrow laws is codified at 15 U.S.C. § 1639d ("Section 1639d"). That section requires a "creditor" "in connection with the consummation of a consumer credit transaction secured by a first lien on the principal dwelling of the consumer" to establish an escrow account for the payment of taxes and insurance for covered mortgage loans. *See* 15 U.S.C. § 1639d(a)–(b); *see also supra* at 2 n.2. The term "creditor" is defined broadly to include, as relevant here, an "organization" that "both (1) regularly extends [credit], whether in connection with loans, sales of property or services, or

otherwise, consumer credit . . . and (2) is the [organization] to whom the debt arising from the consumer credit transaction is initially payable." *Id.* § 1602(e), (g). Under Section 1639d(g)(3), entitled "[a]pplicability of payment of interest," for all escrow accounts required under Section 1639d(a)–(b), creditors are required to pay interest on monies deposited therein "[i]f prescribed by applicable State or Federal law . . . in the manner as prescribed by that applicable State or Federal law." *Id.* § 1639d(g)(3).

Section 1639d(g)(3)'s interest requirements apply to national banks. The relevant definition for "creditor" is broad. *Id.* § 1602(g). It includes national banks when exercising real estate lending powers, *see* 12 U.S.C. § 371(a), a fact that even BOA does not dispute. For such creditors, the provision uses the mandatory "shall pay interest" when "prescribed by applicable State or Federal law" without any express exception for national banks.[4] 15 U.S.C. § 1639d(g)(3). The provision could therefore be summarized as follows: when applicable state law requires a

---

[4] It is notable that Congress, in enacting TILA's amendments, knew how to expressly limit the application of its new provisions vis-à-vis existing federal laws. *See, e.g.,* Dodd-Frank tit. XIV, § 1415, 124 Stat. at 2153 (providing that, unless otherwise provided therein, no provision in 15 U.S.C. §§ 1639b, 1639c (as amended) "shall be construed as superseding, repealing, or affecting any duty, right, obligation, privilege, or remedy of any person under any other provision . . . of Federal or State law"). Congress imposed no similar limitation on Section 1639d's application. *See generally* 15 U.S.C. § 1602 (providing relevant definitions and rules of construction); *see also* Dodd-Frank § 1461(a), 124 Stat. at 2178–81.

national bank to pay interest on an escrow account, it must do so in accordance with that law.

The ordinary meaning of the term "applicable," as applied to "State or Federal law," supports this conclusion. *Id.* Interpreting a different statute, the Supreme Court defined the term as follows:

> "Applicable" means "capable of being applied: having relevance" or "fit, suitable, or right to be applied: appropriate." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 105 (2002). *See also* NEW OXFORD AMERICAN DICTIONARY 74 (2d ed. 2005) ("relevant or appropriate"); 1 OXFORD ENGLISH DICTIONARY 575 (2d ed. 1989) ("[c]apable of being applied" or "[f]it or suitable for its purpose, appropriate").

*Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (alterations in original); *accord Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1195 (9th Cir. 2018) (interpreting Section 1639d).

Defining "applicable" as "relevant" or "having relevance," *see Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 187 (E.D.N.Y. 2019) (applying this definition), is consistent with "the neighboring words with which it is associated," *United States v. Williams*, 553 U.S. 285, 294 (2008); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012) (noting "[o]ne should assume the contextually appropriate ordinary meaning unless there is

reason to think otherwise"). "Applicable" appears ten times in Section 1639d and each use suggests Congress did not intend a specialized meaning beyond simply "relevant." *See, e.g.,* 15 U.S.C. § 1639d(a) (requiring creditors to maintain escrow accounts "for the payment of taxes and hazard insurance, and, if *applicable*, flood insurance, mortgage insurance, ground rents, and any other required periodic payments or premiums" (emphasis added)); *see also id*. § 1639d(j)(2)(A) (requiring lenders to send notice to consumers who waive "escrow services" and include "[i]nformation concerning any *applicable* fees or costs associated with . . . [the] account" (emphasis added)).[5]

There is no reason to construe "applicable," as BOA argues, to exempt all state interest-on-escrow laws as applied to national banks. Appellant's Br. at 50 (arguing such laws are "preempted" and therefore not "able to be applied"). This proposed interpretation asks too much of the text. The section speaks to

---

[5] The use of "applicable" elsewhere in the section does not change the analysis. *Id.* § 1639d(b)(3)(A) (requiring escrow services for certain mortgage loans "having an original principal obligation amount that . . . does not exceed the amount of the maximum limitation on the original principal obligation of mortgage in effect for a residence of the *applicable* size" (emphasis added)); *id.* § 1639d(b)(3)(B) (identical usage); *id.* § 1639d(g)(2)(C) (providing that escrow accounts "shall be administered in accordance with . . . the law of the State, if *applicable*, where the real property securing the consumer credit transaction is located" (emphasis added)); *id.* § 1639d(h)(3) (requiring disclosure of "estimated taxes and hazard insurance, including flood insurance, if *applicable*" (emphasis added)); *id.* § 1639d(h)(4)–(5) (identical usages).

"applicable State or *Federal* law," and Congress would not express an intent to exempt preempted laws in a term applying equally to federal law. *Id.* § 1639d(g)(3) (emphasis added). Moreover, Congress's use of a "broad rule" without any express exception is not an invitation to ignore plain text. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *see also Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) (noting courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply"). As this Court counsels, we do not apply "unstated" purposes in Dodd-Frank to construe the scope of NBA preemption. Maj. Op. at 32. As did Plaintiffs', BOA's argument fails to rebut the presumption that "Congress wrote the statute it wrote—meaning, a statute going so far and no further." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (internal quotation marks omitted).[6]

---

[6] BOA's reliance on *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta* is also misplaced. Appellant's Br. at 50–51 (quoting 458 U.S. 141, 157 n.12 (1982)). In *de la Cuesta*, the Supreme Court held that a California legal doctrine relating to real estate transactions was preempted by federal regulations and that the parties were bound by these regulations pursuant to a provision specifying that a deed of trust "shall be governed by the law of the jurisdiction in which the Property is located." 458 U.S. at 148 (quoting the deed of trust). The Supreme Court construed the term "law of the jurisdiction" to include federal law because "the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution." *Id.* at 157 & n.12 (quoting *Hauenstein v. Lynham*, 100 U.S. 483, 490 (1880)). Here, there is no authority that would require us to construe "applicable" to have anything to do with preemption.

The fact that Congress chose to require national banks to comply with certain state laws via TILA—and not the NBA—does not change the analysis. Congress's decision to place Section 1639d in TILA is logical, given that the section applies to a broad category of creditors, not just national banks, and relates to the terms of residential mortgage loans. *See* 15 U.S.C. § 1601 (congressional findings). Moreover, while the "location" or "manner" of codification is "probative" of congressional intent, *Smith v. Doe*, 538 U.S. 84, 94 (2003), such indicia do not require us to ignore plain text, *see, e.g., Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1328 (7th Cir. 1997) (declining to consider Congress's method of amending a statute when "not faced with statutory ambiguity"). [7]

B.

Construing Section 1639d to contain an implied exemption for national banks would undermine Congress's goals in addressing a "financial crisis that

---

[7] BOA's argument that Congress did not intend to make national banks comply with state interest-on-escrow laws because it did not follow its "usual approach" and amend the NBA is also unpersuasive given the plain text. Appellant's Br. at 47–48. Again, the location of an enactment is one of a number of features that is probative of congressional intent, but it is not "dispositive" of the issue. *See Smith*, 538 U.S. at 94. Moreover, BOA's reliance on *Barnett Bank* for this argument is unavailing, as the Supreme Court did not purport to hold that Congress *must* amend a "federal banking statute" to make "the exercise of [national bank] power . . . subject to state law." 517 U.S. at 34. Rather, *Barnett Bank* reaffirmed that the question of preemption "is basically one of congressional intent." *Id.* at 30. Courts must discern that intent from plain text.

nearly crippled the U.S. economy." S. Rep. No. 111-176, at 2 (2010) (authored by Sen. Dodd). That crisis traced its origins to a downturn in the housing market due to "a raft of unsound lending practices . . . ultimately le[a]d[ing] to the failure of a number of companies heavily involved in making or investing in subprime loans." *Id.* at 40. Congress knew that national banks were among the entities responsible. *See* H. Rep. No. 111-94, at 51 (2009) (authored by Rep. Frank) (noting that approximately less than one-quarter of "[s]ubprime lenders" were "regulated by Federal financial regulators such as banks, thrifts, and credit unions").

Some of the deceptive practices that led to the crisis were addressed through Dodd-Frank's amendments to TILA. *Id.* at 49 (noting Congress sought to "mitigat[e] . . . deceptive practices related to escrow accounts, mortgage servicing, and appraisal practices"). Certain lending practices, in Congress's view, were causing subprime borrowers to voluntarily waive escrow services leading to a disproportionately low adoption rate. *Id.* at 53 (noting "approximately 50 percent of all first lien subprime mortgages had escrows, compared to 71 percent of prime loans"). Congress was concerned about the systemic risk this posed to the financial system. Escrow accounts are essential for payment of "property taxes, hazard insurance, and certain other periodic expenses related to the property or

the contract." *Id.* Without such services, borrowers may "underestimate the monthly payment actually needed to own a home" and be at risk of "tax liens and property losses." *Id.* at 53–54. With respect to subprime borrowers, these risks were amplified due to their poor financial circumstances:

> In general, subprime mortgages are loans that have more costly terms and conditions than "prime" mortgages (e.g., they may have higher interest rates, additional fees, prepayment penalties, or other features). Many subprime loans were made to borrowers who, due to weakened credit histories, pose higher credit risks. These borrowers may have lower credit scores than prime borrowers or higher debt to income ratios on their properties.

*Id.* at 51.

Congress addressed these risks through Section 1639d's escrow provisions, which require lenders to maintain escrow accounts on behalf of certain borrowers considered to be "subprime." *See id.* at 49 ("[T]he escrow provisions . . . require[] all subprime borrowers to have accounts established in conjunction with their mortgages . . . ."); *see also id*. at 53 (noting that "subprime borrowers" need escrow accounts for "budgeting assistance given their weaker credit histories").

It would strain credulity to believe Congress intended to exempt national banks from *any* of its escrow requirements. It is obvious that Congress was aware national banks had a hand in causing the crisis. *Id.* at 51. While it is true that most

subprime loans originated from "mortgage brokers and lenders with no Federal supervision," *id.*, these entities were not solely to blame, *see* FIN. CRISIS INQUIRY COMM'N, THE FINANCIAL CRISIS INQUIRY REPORT 22 (2011) (noting that in 2008 BOA acquired Countrywide Financial Corporation, one of the largest subprime lenders); *see also* NAT'L CONSUMER L. CTR., PREEMPTION AND REGULATORY REFORM: RESTORE THE STATES' TRADITIONAL ROLE AS "FIRST RESPONDER" 11 (2009) ("Mortgage lending by national banks, federal thrifts, and their operating subsidiaries made up 31.5% . . . of the most dangerous, subprime loans during the peak year of 2006."). An exemption for national banks from Section 1639d(g)(3)'s requirements would frustrate Congress's goal to address a problem which confronted our nation.

## III.

Congress undoubtedly has the power to regulate national banks to the exclusion of states—but has thus far declined to do so. As a result, regulation of national banks has been a matter of both federal and state concern since the passage of the first National Bank Act in 1863. *See Watters*, 550 U.S. at 10–11; *see also Nat'l State Bank, Elizabeth, N. J. v. Long*, 630 F.2d 981, 985–86 (3d Cir. 1980) (tracing the NBA's history). While state law "must usually govern the activities of

both national and state banks," *Watters*, 550 U.S. at 25 (Stevens, J., dissenting), the New York law at issue is preempted because it seeks to control the exercise national bank powers conferred by Congress.  But that law, as applied to national banks, is not preempted under all circumstances.  Congress, through Dodd-Frank, has directed national banks, to comply with state interest-on-escrow laws when financing mortgage loans that are, unlike Plaintiffs', covered by that act.  A conclusion made inevitable in light of the text and Congress's goals in dealing with the subprime mortgage crisis—a crisis national banks helped create.

Based on the foregoing, I respectfully concur.